LOPER SHEET METAL, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 3531–67.   Filed December 8, 1969.

*Philip G. Gallant*, for the petitioner.
*James A. Thomas*, for the respondent.

STERRETT, *Judge:* Respondent determined deficiencies in the income tax of the petitioner of $2,142, $4,748.88, and $1,584 for its taxable years ended October 31, 1963, October 31, 1964, and October 31, 1965, respectively. The only issue for decision is whether petitioner is entitled to deduct its contributions to a profit-sharing trust.

### FINDINGS OF FACT

Some of the facts have been stipulated and those facts are so found.

Loper Sheet Metal, Inc. (hereinafter sometimes referred to as petitioner or Loper), is a California corporation which had its principal office and place of business in Van Nuys, Calif., at the time its petition was filed herein. Petitioner filed its Federal income tax returns for the fiscal years ending October 31, 1963, 1964, and 1965, with the district director of internal revenue at Los Angeles, Calif. Petitioner keeps its accounts and reports its income on an accrual method of accounting.

Petitioner was incorporated on or about November 2, 1962, and since that time has been engaged in the business of sheet-metal fabrication. Since the formation of the petitioner, all of its capital stock has been owned in equal amounts by Charles Wood and Otto Meinhardt, who also serve as its president and vice president, respectively. Prior to the formation of the petitioner Wood and Meinhardt had been carrying on the identical business as a partnership trading as Loper Sheet Metal Co. Wood was born on October 2, 1915, and Meinhardt on May 16, 1913.

On July 1, 1961, the petitioner's predecessor, Loper Sheet Metal Co., entered into a collective-bargaining agreement with Local Union No. 108 of the Sheet Metal Workers' International Association (sometimes hereinatefr referred to as union). Upon the formation of Loper

Sheet Metal, Inc., this agreement was adopted by and became binding upon the petitioner.

The agreement required petitioner to make contributions on behalf of its union employees to the "Sheet Metal Workers' Pension Plan of Southern California" (hereinafter referred to as the union plan). The union plan was established on September 11, 1958, at which time approximately 5,000 employees, belonging to several local unions, were covered. On September 28, 1959, the district director of internal revenue at Los Angeles, Calif., ruled that the union plan met the requirements of section 401 (a) of the Internal Revenue Code of 1954 [1] and that the trust forming a part thereof was entitled to exemption from tax under section 501 (a).

The aforesaid collective-bargaining agreement obligated petitioner to pay its union employees hourly rates and to contribute to the union plan in the following amounts and in the following percentages of union employees' wages:

| Date | Hourly wage | Contribution per hour | Percentage |
|---|---|---|---|
| July 1, 1962 ,to} July 1, 1963 | $4. 46 | $0. 11 | 2. 46 |
| July 1, 1963, to} July 1, 1964 | 4. 69 | 0. 13 | 2. 77 |
| July 1, 1964, to} July 1, 1965 | 4. 96 | 0. 13 | 2. 62 |
| July 1, 1965, to} [2] July 1, 1966 | 5. 45 | 0. 16 | 2. 94 |

Petitioner did in fact comply with the collective-bargaining agreement.

The union plan contained five types of pensions with different eligibility requirements and paying varying benefits. An employee can retire on a "Normal Pension," which provided the maximum benefit, if:

(a) he has attained age 65; and

(b) he has accumulated at least twenty-five years of credited service (called Pension Credit in the plan) ; [3] and

(c) he has accumulated at least two quarters of Pension Credit since his Contribution Date,[4] or has worked a total of at least 750 hours during the eighteen month period next immediately following such Contribution Date.

---

[1] All section references are to the Internal Revenue Code of 1954 unless otherwise stated.

[2] On July 1, 1965, petitioner entered into a new collective-bargaining agreement with the union with the results noted.

[3] Pension Credit is composed of two components. For past service an employee is entitled to 1 year of Pension Credit for each calendar year prior to his Contribution Date in which he has worked 40 weeks. In addition, it is presumed that members of the union, prior to the Contribution Date, were working so that membership in the union causes accrual of Pension Credit. For future service an employee receives 1 year of Pension Credit for each calendar year in which he is employed for 1,500 or more hours.

[4] For the purposes of this case "Contribution Date" may be defined as Jan. 1, 1958.

The maximum monthly pension benefits payable during the years in issue were:

| Effective date | Maximum benefit |
|---|---|
| Jan. 1, 1959 | $70.00 |
| Jan. 1, 1963 | 95.00 |
| Jan. 1, 1965 | 112.50 |

Due to subsequent amendments of the union plan maximum monthly benefits were increased to $150 per month effective April 1, 1966, and then to $180 effective July 1, 1967. Under these amendments the rate at which benefits were earned was increased retroactively to cover all those who retired after the effective dates.

A second type of pension, called "Reduced Pension," contained identical eligibility requirements to those for the "Normal Pension" except that "at least 15 years but less than 25 years of Pension Credit," are required. The amount of the pension is computed by multiplying one twenty-fifth of the "Normal Pension" by the number of years of "Pension Credit" of the particular employee.

The third type of pension, "Early Retirement Pension," permitted retirement at age 55 or thereafter. The amount of the "Early Retirement Pension" is computed by first determining whether the employee would be entitled to a "Normal" or "Reduced Pension" if he were 65 and then reducing this amount by 0.5 percent for each month that the retiring employee is younger than 65.[5]

The fourth pension provided for was the "Disability Pension." In order to be eligible the employee must be totally and permanently disabled, 50 years old, have 15 years of "Pension Credit," and meet the same other requirements of the aforementioned types of pensions. The amount is computed in the same fashion as the "Reduced Pension." [6]

Under the union plan as in effect in January of 1960 there was no provision for vesting of "Pension Credit." Under the plan as of January 1, 1965, an employee with 25 or more years of Pension Credit or who is 55 with at least 15 years of Pension Credit has vested rights under the plan. The plan provided that a participant who continued employment beyond the age of 65 would not, thereby, be entitled to a higher pension.

Further, the union plan provided that if a pensioner should die within the 3-year period beginning with the effective date of the pension payments, the payments are to continue until a total of 36 monthly payments have been made to the pensioner and his designated

---

[5] As of Jan. 1, 1965, the method of computing the amount of the "Early Retirement Pension" was amended. The "Normal" or "Reduced Pension" is reduced by 0.25 percent for each month the employee is younger than 65 and by 0.5 percent for each month younger than 60.

[6] The age attainment of 50 years was dropped from the requirements as of Jan. 1, 1965.

beneficiary. In addition, effective in January of 1965, upon the death of a participant at a time when he is entitled to receive benefits, a death benefit of $500 is payable to his beneficiary if application therefor is made within 1 year of the date of death.

During 1963, the petitioner employed five full-time union employees for the entire year; Powell, Kamine, Reno, Warmouth, and Scholl. Compensation paid them for that year was: $9,999.12, $10,239.13, $10,330.30, $9,635.93, and $9,865.90, respectively. In December of 1963 Nichols was hired on a permanent basis and paid $469. During 1963 three other union employees were employed for periods of less than 5 months at total compensation of $3,698.78.

During 1964 petitioner employed six full-time union employees; Powell, Kamine, Reno, Warmouth, Scholl, and Nichols for that full year. Compensation paid them was: $10,813, $10,473, $9,469, $10,477, $10,096, and $7,508, respectively. Leash was employed from May through December of 1964 and received $6,465. Five other union employees were employed for periods of less than 5 months at a total compensation of $9,329.

During 1965, petitioner employed six full-time union employees; Powell, Kamine, Warmouth, Scholl, Nichols, and Anderson for the entire year. Compensation paid them was: $9,973, $10,722, $10,509, $10,040, $8,611, and $10,884, respectively. Reno was employed until August 9, 1965, and received $6,659. Sixteen other union employees were employed for periods of less than 6 months at total compensation of $10,476.

On July 30, 1963, the petitioner adopted a profit-sharing plan. Under this plan salaried employees with 1 year of continuous service after the effective date of the plan and salaried employees employed at the time of the adoption of the plan were eligible to participate. During the years here in issue the profit-sharing plan excluded employees who were members of the union.

The profit-sharing plan also provided:

The percentage of contribution of the employer from its profits for any salaried employee, based upon such salaried employees [sic] compensation, shall NOT exceed the percentage of contribution of the employer from it [sic] profit from [sic] any hourly employee based upon such hourly employees [sic] compensation under negotiated plan of the employer with the Sheet Metal Workers [sic] International Association Local #108.

The plan further provided:

Such contributions shall be made out of accumulated profits or current net profits, before deduction of Federal income taxes, and other Federal and State taxes based on income or sales. For this purpose, net profits shall be determined in accordance with accepted accounting principles and methods, as applied in a consistent manner by the company. In no event shall the amount to be contributed by the company in any year exceed the maximum amount deductible under sec-

tion 404(a)(3) [7] of the Internal Revenue Code of 1954, and the regulations appertaining thereto.

Although the profit-sharing plan stated that contributions under said plan were not to exceed contributions under the union plan,[8] contributions in fact represented 15 percent of the compensation of the two sole participants, Wood and Meinhardt.[9] For the years in issue contributions and compensation were as follows:

| Year ended Oct. 31— | Employee | Contribution | Compensation |
|---|---|---|---|
| 1963 | Wood | $3,570.00 | $23,800 |
| | Meinhardt | 3,570.00 | 23,800 |
| 1964 | Wood | 4,717.50 | 31,450 |
| | Meinhardt | 4,717.50 | 31,450 |
| 1965 | Wood | 3,600.00 | 24,000 |
| | Meinhardt | 3,600.00 | 24,000 |

Using an assumed rate of earnings at 4 percent, $3,570 will provide a pension at age 65 of $742 per annum for Wood (age 48 in 1963) and $680 for Meinhardt (age 50 in 1963). $8,390.31, the assumed account balance of each at the end of fiscal 1964, will provide a pension at age 65 of $1,670 and $1,528 per annum for Wood and Meinhardt, respectively. $12,358.19, the assumed account balance of each at the end of fiscal 1965, will provide an annual pension at age 65 of $2,354 and $2,153 for Wood and Meinhardt, respectively.

The profit-sharing plan provided that a participating employee's account becomes vested as follows:

| Years in plan | Percent vested |
|---|---|
| Less than one | 0 |
| 1 but less than 2 | 10 |
| 2 but less than 3 | 20 |
| 4 years and over | 100 |

Notwithstanding the foregoing schedule, a participant becomes 100-percent vested upon reaching age 65. Upon disability a participant in the plan would be entitled to the full amount in his account.

Upon normal retirement a participant receives the balance of his account in a method to be selected by him. The plan also permitted the continued employment of a participant beyond retirement age. In which case contributions under the plan are maintained. The plan also

[7] Sec. 404(a)(3) provides that, generally, deductions are limited to 15 percent of the compensation paid to all employees under the profit-sharing plan.

[8] Apparently the inclusion of the paragraph relating to the limitation of contributions under the profit-sharing plan to the level of contributions under the union plan was inadvertent. It was the intent of petitioner that contributions under the profit-sharing plan be equal to 15 percent of compensation.

[9] During the years in issue petitioner had only one other salaried employee, Mrs. Muriel Spark. Her employment as a secretary-receptionist commenced on May 10, 1965, and terminated on Feb. 3, 1967. She was paid total wages of $1,909.38 for May 10 to Oct. 31, 1965. No contributions to the profit-sharing plan were made on her behalf during the years in issue.

permitted early retirement within 5 years of normal retirement date if at least 10 years of participation in the plan have been concluded.

Further, the profit-sharing plan provided that in the event of a participant's or retired participant's death the full amount in the said participant's account is to be distributed to the named beneficiary. Additionally, any life insurance contracts are to be made available to such beneficiary.

A participant whose account is 100-percent vested may borrow up to 50 percent of its value. The loan must be repaid within 3 years with 5-percent interest.

By letter dated June 15, 1965, the district director of internal revenue at Los Angeles, Calif., was requested to issue a determination that the petitioner's profit-sharing plan met the requirements of section 401(a) and that the trust thereunder was exempt from taxation under section 501(a), and that contributions by the petitioner thereto were deductible under section 404. On July 1, 1966, the district director's office issued an adverse determination.

On its income tax returns of the years ending October 31, 1963, 1964, and 1965, petitioner deducted $7,140, $9,435, and $7,200, respectively, as contributions to the trust established under its profit-sharing plan. The respondent by notice of deficiency mailed April 12, 1967, disallowed these deductions in toto.

OPINION

Petitioner claims deductions of $7,140, $9,435, and $7,200 for contributions to its profit-sharing trust. Section 404 (a) provides that such contributions are deductible only if such trust is exempt from taxation under section 501 (a). Section 501 (a), in turn, provides that a trust will not be exempt unless the requirements of section 401 (a) are met.

Considered by itself petitioner's profit-sharing trust does not qualify under section 401 (a). Only Wood and Meinhardt, the sole officers and shareholders of petitioner were eligible to participate during the years in issue, while the five or six full-time union employees were excluded from eligibility. It is patent that the terms of section 401 (a) (3) (A) could not be satisfied because far less than 70 percent of all full-time employees were eligible to benefit. Section 401 (a) (3) (B) was also violated. While section 401 (a) (3) (B) gives recognition to a plan which covers only such employees as qualify under a classification set up by the employer, and section 401 (a) (5) provides that a classification shall not be considered discriminatory merely because it is limited to salaried or clerical employees, both of these provisions are modified by the requirement of section 401 (a) (3) (B) and (a) (4)

that the classification, contributions, and benefits provided under the plan must not discriminate in favor of employees "who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees." See, e.g., *Ed and Jim Fleitz, Inc.*, 50 T.C. 384 (1968).

However, according to the terms of section 401 (a)(3) as well as section 1.401–3(f), Income Tax Regs., we may view the profit-sharing plan and the union plan as one unit. In this light the profit-sharing plan and the union plan meet the coverage requirements of section 401 (a)(3).

Thus narrowed, the controversy may be viewed as residing primarily within the lines of section 401 (a)(4) which states that a trust will be qualified, "if the *contributions* or *benefits* provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees." (Emphasis supplied.)

In determining whether the contributions under the profit-sharing and union plans at issue were discriminatory within the meaning of the above provision, it is appropriate to compare the percentage of contributions of compensation made on behalf of the officers to that made on behalf of the union employees. During the years before the Court the petitioner contributed an amount equal to 15 percent of the salaries of the two officers for their account in the profit-sharing trust. In contrast petitioner's contribution to the union pension trust never exceeded an amount equal to 3 percent of the total compensation paid the union employees. This 5 to 1 ratio in favor of the officers and shareholders seems patently discriminatory.

When we turn to making the requisite comparison of benefits payable under the pension and profit-sharing plans, we run into some difficulty for we are essentially comparing apples and oranges. Pension plans provide for definitely determinable benefits. Profit-sharing plans, on the other hand, provide for contributions and do not purport to spell out a definitely determinable benefit to be paid upon retirement. Since the contributions to the profit-sharing trust may vary from one year to the next dependent upon many extraneous factors, it is obviously impossible to predict with any degree of precision the benefits to be paid on some future occasion.

To circumvent this dilemma we compared the benefits that are payable under the two plans as a result of the contributions made to the trusts only during the years in question.[10]

---

[10] It follows from this approach that the effect of our holding is limited to the years before us.

We find that such a comparison affirmatively shows the profit-sharing plan to be discriminatory. In July of 1967 the maximum benefit under the union plan was increased retroactively to $180 per month. We will use this amount in our computations in order to make a comparison most favorable to the petitioner. The union plan provides that a "Normal Pension" of $180 per month is payable to a participant with at least 25 years of pension credit. Therefore 1 year of service accrues a pension of $7.20 per month or $86.40 per year payable at age 65 for life. If we assume that a given union employee earns $10,000 per year [11] his pension would be 0.864 percent of compensation as the result of his 1 year of coverage. In order to arrive at a percent of compensation for an employee under the profit-sharing plan we begin with the actual contribution, which for 1963 was $3,570 for each Wood and Meinhardt. Using an assumed rate of earnings of 4 percent it is possible to determine actuarially that this amount would provide a yearly pension payable at age 65 for life [12] of $742 for Wood and $680 for Meinhardt. Wood and Meinhardt received compensation of $23,800 each for 1963 and their respective annuities would therefore be 3.1 percent of compensation for Wood and 2.9 percent for Meinhardt. This is roughly 3.5 times greater than the union benefit of 0.864 percent.

Making a comparable comparison of the cumulative totals for the years 1963–64, we find that Wood and Meinhardt would be entitled to a yearly pension at age 65 of $1,670 and $1,528, respectively. The union employee would receive $172.80 annually at age 65. The benefits payable compared to the average salary earned in 1964–65 would be 6.1 percent and 5.5 percent for Wood and Meinhardt, respectively, and 1.728 percent for the union employee, a disproportion of over 300 percent.

Finally, to make a comparison of the 3-year cumulation totals, 1963–65, Wood and Meinhardt would upon retirement at age 65 receive an annual annuity of $2,354 and $2,153, respectively, and a union employee an annuity of $259.20 annually. Again comparing the annuity payable to the average compensation paid during the years 1963–65 the benefit represents 8.9 percent and 8.1 percent of Wood and Meinhardt's compensation, respectively, and 2.592 percent of the union employee's. The benefits payable to the stockholder-officers remain three times in excess of that paid union employees.

---

[11] We chose $10,000 as fairly representative of the salaries of full-time union employees during the years in issue. In reality the average salary is in excess of this amount; therefore use of the $10,000 figure increases the percent of contribution compared to compensation, an assumption beneficial to petitioner.

[12] The reason for the variance in the amount of the pensions is the respective ages of Wood and Meinhardt. In 1963 Wood was 48 and Meinhardt 50.

In view of the foregoing it is apparent that we find that the plans fail to meet the nondiscriminatory requirement of section 401(a)(4) both with respect to contributions and benefits. We need not, however, base our decision solely on the foregoing projected pensions. Our comparison of the other features of the two plans reveals further evidences of the prohibited discrimination.

Under the union plan effective January 1, 1965, an employee had vested rights only after 25 or more years of service or after he has attained the age of 55 with 15 years of service. A participant in the profit-sharing plan has fully vested rights after 4 years of participation. With respect to this factor petitioner directs our attention on brief to *Hall* v. *United States*, 398 F. 2d 383 (C.A. 8, 1968), which held that differences in vesting do not of themselves violate section 401(a)(4). This we do not gainsay; however, we recognize and the Court of Appeals in *Hall* stated: "Vesting is an important benefit in any pension plan and is one which must be considered in reaching a decision as to whether a plan is discriminatory as to benefits." *Hall* v. *United States, supra* at 387. Provisions as to vesting are merely one thread in the fabric of a complete deferred compensation plan and it is in this light that we have considered it. Under the union plan if an employee "retires" before he has 15 years of service he will receive no benefit. Under the profit-sharing plan an employee who terminates his service after 4 years will receive 100 percent of his account.

Under the profit-sharing plan a participant who has attained 100-percent vesting may borrow up to 50 percent of his account for 3 years at 5-percent per annum. There is no comparable provision in the union plan. On brief the petitioner argues that this is not a benefit because such a loan could be procured from a commercial lender. In view of the interest rates currently available in the market place, this argument seems ill-timed to say the least.

Another feature of the profit-sharing plan provides that an employee may continue employment after retirement age and contributions under the plan will be maintained. The union plan specifically provides that employment after age 65 will not increase pension benefits otherwise available. At trial respondent's expert witness testified as to the value of this election to continue employment. We are not inclined to weigh this factor heavily against the petitioner due to the admitted unreliability of the respondent's projections in this regard. It suffices to say that some small benefit, thereby, flows to participants in the profit-sharing plan which union employees do not have. It is true, as petitioner points out, that a participant under the profit-sharing plan must work an additional 5 years in order to accrue a greater pension; however, we feel that such participant has an advantage merely by the fact that he is presented with the choice.

In the event of disability a participant of the profit-sharing plan would receive the full amount standing to his account if such disability occurs at anytime before retirement. Under the pension plan there is no disability pension until the employee has completed 15 years of service.

Under the profit-sharing plan upon the death of a participant, or of a terminated or retired participant, the trustee must distribute the full amount in the decedent's account together with any insurance proceeds to the decedent's beneficiary. The union plan provides that upon the death of a pensioner his beneficiary would be entitled to receive payment until a total of 36 monthly payments have been made to the pensioner and his beneficiary. In addition, effective in January of 1965 the beneficiary of a deceased pensioner would be entitled to a $500 death benefit. It seems to us that in this respect too the guaranteed payment due under the profit-sharing plan is superior.

Petitioner argues on brief that a welfare plan to which it made contributions provides extensive death benefits and that we should read the two plans together. Without passing on whether this assertion is correct we note that we cannot comply with petitioner's request as no evidence concerning death benefits under this welfare plan was offered.

In view of the foregoing facts and circumstances and in view of the petitioner's failure to show that the respondent's determination was erroneous,

*Decision will be entered for the respondent.*