Myrna MYRON, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 72-2844-AAH.

United States District Court,
C. D. California.

Aug. 28, 1974.

Flint & MacKay, Los Angeles, Cal., for plaintiff.

William D. Keller, U. S. Atty., Los Angeles, Cal., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

(NO REFUND OF INCOME TAXES TO MYRNA MYRON-DISCRIMINATORY OPERATION OF PENSION PLAN)

### FINDINGS OF FACT

HAUK, District Judge.

1. This is an action for the refund of federal income taxes and interest there-

on collected from the plaintiff by the defendant.

2. The plaintiff is a resident of Los Angeles, California.

3. The District Director of Internal Revenue, Los Angeles, California, performed an audit of the corporate income tax returns of Myron's Ballroom (Ballroom) and Myron's Enterprises (Enterprises) for each of their fiscal years ending September 30, 1967 and September 30, 1968. In doing so, the District Director determined that the corporations' joint retirement income plan (Plan) which became effective beginning in their fiscal years ending 1967, was not a qualified deferred compensation plan under provisions of the Internal Revenue Code of 1954 (26 U.S.C.) due to discriminatory operation in favor of their sole shareholder-President, Myrna Myron (Myron). Accordingly, the payments made into the Plan by the corporations in the total amount of $13,192.60 for each such year was determined to constitute additional income from compensation earned by plaintiff, Myrna Myron, for 1967 and 1968.

4. The compensation adjustment, together with other adjustments which are not in issue, resulted in net deficiencies of income taxes for 1967 and 1968 in the respective amounts of $8,535.00 and $9,341.00 which were timely assessed against Myron together with interest in the respective amounts of $1,831.63 and $1,444.14 for a total assessment in the sum of $21,151.77.

5. On December 27, 1971, Myron paid in full the total assessment as previously set forth.

6. On May 24, 1972, Myron filed formal claims for refund of such taxes and interest.

7. On March 20, 1973, Myron was formally notified by a delegate of the Commissioner of Internal Revenue that her claims for refund were disallowed.

8. Subsequently, the instant action was timely commenced.

9. Ballroom and Enterprises are each corporations which were incorporated in the State of California on the respective dates of August 30, 1955 and December 31, 1957. The business functions of the corporations are the operation of a public ballroom, which serves alcoholic beverages.

10. Myron has been the sole shareholder, Chairman of the Board of Directors, President and General Manager of Ballroom and Enterprises since their incorporation through the years in issue.

11. On September 28, 1967, the Boards of Directors of Ballroom and Enterprises adopted a resolution approving and adopting a retirement income plan and trust (Plan) the effective date for which was September 30, 1967.

12. The germane provisions of the Plan relating to the instant issue is set forth as follows:

1.07 DEFINITIONS

(a) "Employers" shall mean Myron's Enterprises, a California corporation, and Myron's Ballroom, a California corporation, the successor in interest of either of them or any corporation or business organization which, as hereinafter provided, shall assume the obligations of this plan with respect to their employees, or any other affiliated or subsidiary corporation of the Employers, or either of them, which shall agree to become a party to this plan.

\* \* \* \* \* \*

(d) "Participant" means any employee who has fulfilled the eligibility requirements set forth herein and who has elected to join the Plan.

(e) "Employee" shall mean any person, including an officer, who is regularly employed by the Employers, or either of them, on a fulltime basis for a regular fixed compensation, excluding those persons who work less than 20 hours per week or less than 5 months per year.

\* \* \* \* \* \*

(h) "Continuous Service" means service as an Employee which has continued without interruption since the last starting date of employment by one of the Employers; provided, however, that continuous service shall not be deemed to have been interrupted by authorized leaves of absence or lay-off by the Employers for less than one (1) year due to lack of work, or service in the Armed Forces of the United States. Any leave of absence shall be granted in accordance with established policies of the Employers, administered in a non-discriminatory manner.

\* \* \* \* \* \*

## 2.01 ELIGIBILITY

(a) Employees eligible to become Participants under the Plan may do so only as of the Effective Date or any Anniversary Date of the Plan. An Employee, as hereinbefore defined, to be eligible, must have attained the age of 21 years but not 66 years, must have completed twenty-four (24) months of continuous service as an employee, and must be actually working for the Employers on the Effective Date or the Anniversary Date he elects to become a Participant under the Plan.

\* \* \* \* \* \*

## 3.04 DEATH BENEFIT BEFORE RETIREMENT

If a Participant dies prior to his Normal Retirement Date, the following death benefit shall be paid to his Beneficiary. The death benefit shall consist only of the proceeds from life insurance policies purchased by the Trustee upon the life of each Participant in the following amounts.

(a) If the Participant is insurable at standard rates by the carrier issuing the policy, the amount shall be equal to:

ONE HUNDRED (100) TIMES the Participant's estimated monthly retirement income.

\* \* \* \* \* \*

## 3.06 SEVERANCE BENEFITS

(a) If the employment of a Participant is terminated for any reason other than death or total disability before Normal Retirement Date, the Participant shall be entitled to and the Advisory Board shall direct the Trustee to pay to him severance benefits equal to One Hundred Per Cent (100%) of his Individual Trust Estate, regardless of when such termination occurs.

\* \* \* \* \* \*

## 6.04 ABSENCES

If the earnings of a Participant are suspended as a result of temporary absence from work because of leave, sickness, accident or lay-off, the Participant shall continue to remain under the Plan so long as his employment by either or both of the Employers has not been terminated.

\* \* \* \* \* \*

13. On November 3, 1967, National Associates, Inc., on behalf of Ballroom and Enterprises, requested the District Director of Internal Revenue for an advance determination that the corporations' Plan qualified under the provisions of the Internal Revenue Code of 1954. National Associates, Inc., stated that the only employee qualified to participate under the Plan was Myron.

14. A representative of National Associates, Inc., examined the corporate books and records of the two corporations furnished by Myron and thereupon furnished the following information to the Internal Revenue Service in a letter dated November 3, 1967 (Plaintiff's exhibit 25):

"Gentlemen:

Enclosed you will find Pension Information Forms for the above Plan, together with executed copies of the Plan and Trust Instruments and the Resolutions of the Boards of Directors

of the two corporations involved. Also enclosed you will find one Specimen Life Insurance Contract and the Illustration of Benefit Form for Employees.

You will observe that Myron's Enterprises shows eighteen temporary or part-time employees, not covered by length of service, and one participant. The one 'length of service' employee is the full time manager, who has not yet served the required two years of service. The other employees at any given time are cocktail waitresses and bartenders who work more or less by the day. In other words, there is very little continuity of service among these people, since they are hired as the occasion arises, from the hiring hall.

Likewise, under the Myron's Ballroom Form, the twelve temporary or part-time employees are members of various bands who play in the ballroom. These groups also change from time to time and there is no continuity of their service with the Myron's firm. We will appreciate your review of this information and the material submitted, and your advice as to the qualification of the Plan and Trust.

Please let us know if there is any additional information you require.

Yours very truly,

NATIONAL ASSOCIATES, INC.

By:

Robert E. Green"

15. On December 8, 1967, the District Director of Internal Revenue formally notified Ballroom and Enterprises that the Plan was qualified. In doing so, the notification contained the following statement:

Your attention is directed, however, to section 1.401–1(b)(3) of the Income Tax Regulations which states in part: "The law is concerned not only with the form of a plan but also with its effects in operation." You are also advised that this determination letter in no way relates to, nor constitutes

approval of, any subsequent alteration or amendment of the plan, or of its termination.

16. During 1969, the Internal Revenue Service commenced an audit of the corporation income tax returns of Ballroom and Enterprises. During the course of the audit, it was determined that the operational facet of the Plan was discriminatory since, in addition to Myrna Myron, five other employees of the corporations were also qualified to participate. During the audit and at a meeting with representatives of the Internal Revenue Service in 1969, Myron made an offer on behalf of the corporations to correct the coverage of the Plan by having the corporations pay into the Plan sufficent funds retroactively to cover the employees which the Internal Revenue Service agent had determined should have been covered. The Internal Revenue Service rejected Myron's offer to retroactively cure the discriminatory operation of the Plan.

17. During the years in issue, Ballroom and Enterprises were normally open for business during the evening hours of Wednesday, Friday, Saturday and Sunday, and during Sunday afternoon; a total of approximately 20 hours a week. Further, portions of the ballroom, such as the balcony portion, were not always open during all of the evenings.

18. From 1965 through 1968 Ballroom and Enterprises employed an average of 20 and 16 employees who except for band members were compensated on an hourly basis. Myron was compensated on the basis of an annual salary.

19. Ballroom and Enterprises each maintain its books and records and reports its income and expenses on the accrual method of accounting.

20. While the evidence is not entirely one sided, it is clear that in addition to Myron, five employees should have been included in the Plan because they were continuously employed within the meaning of the law for more than two years.

Moreover, they worked over 20 hours per week customarily and were customarily employed more than five months in a year. Thus, we find that two employees of Ballroom were qualified and eligible to participate under the provisions of the Plan during its fiscal year ending September 30, 1967, and three employees were so qualified during its fiscal year ending September 30, 1968.

21. We further find, despite the conflict in the evidence, that in addition to Myron, two employees of Enterprises were continuously employed within the meaning of the law for more than two years. Moreover, they worked over 20 hours per week customarily and were customarily employed more than five months in a year. Thus, we find that two employees of Enterprises were qualified and eligible to participate under the provisions of the Plan during each of the corporation's fiscal years ending September 30, 1967 and 1968.

22. The operational facet of the Plan was discriminatory during the years in issue.

23. In December of 1973, Myron's Ballroom issued its check to the Plan trustee in the amount of $1,878.85 for the purpose of retroactively covering the three employees George Busse, Alberto Olarte and Raymond Robles for the period 1967 to 1971.

24. In December of 1973, Myron's Enterprises issued its check to the Plan trustee in the amount of $1,939.84 for the purpose of retroactively covering the two employees, Helen Falvegat and Elsie Scivier, for the period 1967 to 1971.

25. In December of 1971, Myron's Ballroom and Myron's Enterprises signed contracts with various unions after a two-week strike. Under the union contracts, all employees of both corporations were covered by union plans to which the corporations made contributions.

26. The determination that only Mrs. Myron was covered under the provisions of the Plan was made by National Associates, Inc., from their examination of the books and records of Myron's Ballroom and Myron's Enterprises, and Mrs. Myron took no part in that determination and relied on National Associates, Inc.

27. The pension plan information Forms 2950 which were filed with the 1967 and 1968 corporate income tax returns for Myron's Ballroom and Myron's Enterprises were prepared by National Associates, Inc., and were attached to said returns by the corporations' accountant, Mr. McKnight. The corporation income tax returns were inspected and signed by Mrs. Myron at the time of filing with the Internal Revenue Service.

28. The omission of three employees of Myron's Ballroom and two employees of Myron's Enterprises from the pension plan was a mistake caused by National Associates, Inc., and was not knowingly done by National Associates, Inc., or so negligently done as to constitute an intentional act on their part.

29. Mrs. Myron was not aware there were any problems with the corporations' pension plan until the auditing revenue agent discovered it and brought it to her attention in 1969.

30. Any conclusion of law deemed to be a finding of fact is hereby found as a fact.

## CONCLUSIONS OF LAW

1. This action was brought under 28 U.S.C. Section 1346(a)(1) and the Internal Revenue Code of 1954, Section 7422(a) (26 U.S.C.). The Court has jurisdiction over the parties and the subject matter of this action.

2. The issue in this tax refund action involves whether the operational facet of Ballroom's and Enterprises' Plan was discriminatory in favor of their sole shareholder and chief executive officer Myron, within the meaning

of Section 401(a)(3) and (4) of the Code.[1]

3. In enacting the statutory provisions in question, Congress recognized that prior to 1942 the exemption that had been previously enacted, though well intentioned, had become twisted into a means of tax avoidance for the benefit of those in high income tax brackets. The purpose of the 1942 revision was "to insure that stock bonus, pension, or profit-sharing plans are operated for the welfare of the employees in general, and to prevent the trust device from being used for the benefit of shareholders, officials, or highly paid employees." H. Rep. No. 2333, 77th Cong., 2d Sess., p. 103 (1942–2 Cum.Bull. 372, 450); S. Rep. No. 1631, 77th Cong., 2d Sess., pp. 136–138 (1942–2 Cum.Bull. 504, 606–607); 81 Cong.Rec., p. 5125. See also Commissioner v. Pepsi-Cola Niagara Bottling Corp., 399 F.2d 390 (2d Cir., 1968). As stated by Judge Friendly in *Pepsi-Cola, supra,* p. 392:

> The movement for reform of the deduction for pension, profit-sharing and bonus plans had begun with a message to Congress from President Roosevelt on June 1, 1937. This incorporated a letter from the Secretary of the Treasury stating that the exemption "has been twisted into a means of tax avoidance by the creation of pension trusts which include as beneficiaries only small groups of officers and directors who are in the high income tax brackets." 81 Cong. Rec. 5125, 75th Cong., 1st Sess. After investigating and deciding that correction was indeed in order, Congress had to determine in what manner to move from the agreed general purpose to legislation that could be practically applied to the thousands of varying situations with which the Internal Revenue Service would be faced. Congress adopted a two-fold approach.

Plans would qualify if a sufficient proportion of the firm's employees were eligible or participated. If, however, a plan's coverage provisions were not so broad as to include the minimum percentage of employees prescribed in § 401(a)(3)(A), they were to be subjected to a more intensive scrutiny by the Treasury Department whose nature the legislature could prescribe only in a more generalized way. Restrictive plans were to qualify only if the Secretary or his delegate were to find that the eligibility requirements were not "discriminatory" in favor of officers, shareholders, supervisors, or "highly paid employees." * * *

4. Thus, to correct abuse of the deferred compensation plans, Congress prescribed that in order for a plan to "qualify," employer contributions must bear a "uniform relationship" to compensation so that no highly paid employee, official, or shareholder could receive a greater percentage of the deferred compensation pie than he received from the regular or basic compensation pie. Code Section 401(a)(5).

5. Congress has provided significant tax advantages for employers who establish pension or profit-sharing trusts for their employees. To qualify for those advantages, a trust must meet the tests set forth in Section 401(a) of the Code and the related Treasury Regulations. The resulting tax advantages for qualified trusts are (1) exemption from taxation for the trust (Section 501(a)) (2) employer deductions from income for contributions to it (Section 404 (a)); and (3) exclusion of income by the employee for whose benefit the payment into the plan is made (Section 402(a)). With respect to coverage of employees, a plan can qualify only if it meets one of two tests of coverage set forth in Section 401(a)(3) of the Code.

1. Section 401(a) was originally enacted as Section 162(a) of the Revenue Act of 1942, c. 619, 56 Stat. 798, which substantially amended Section 165(a) of the Internal Revenue Code of 1939. The section was reenacted as 1954 Code Section 401(a), and was amended in 1962.

Of those two tests, which prescribe the only permissible limitations on coverage where the employer chooses to include some, but not all, of his employees, one is arithmetic and the other is necessarily a matter of judgment. The arithmetic test operates to qualify a plan if the plan automatically covers 70 percent of all employees, or if participation is available to at least 70 percent of all employees and 80 percent of those eligible actually come under the plan. Section 401(a)(3)(A). Under the second test, a plan which does not meet the arithmetic test of Section 401(a)(3)(A) may nonetheless qualify if it benefits—

(B) such employees as qualify under a classification set up by the employer and found by the Secretary of his delegate not to be discriminatory in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees;

6. In addition to the tests of coverage, a plan qualifies only "if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees." Section 401(a)(4). See Cornell-Young Co. v. United States, 469 F.2d 1318 (5th Cir., 1972).

7. Thus, Congress has set forth an arithmetic test to determine whether a plan covers a sufficient number of employees and, at the same time, has provided for the qualification of plans which do not meet the arithmetic test so long as such plans are not "discriminatory" as defined by the statute and found by the Commissioner.

8. Under the formula set forth in Section 401(a)(3)(A), as illustrated in Section 1.401–3(a)(3) of the Regulations, all temporary (less then 5 months per year), part-time (less than 20 hours per week) or minimum period of employment (not exceeding 5 years) employees may be excluded before the 70 percent, or 70 percent—80 percent, coverage tests are applied. The Code requires that the minimum period of employment must be specified in the plan. Here, the 24-months of continuous service requirement found in Article 2.01(a) of the Plan is the only reference to length of service. Therefore, it contains a 2-year length of service requirement and under the evidence each corporation had in addition to Myron two employees who had worked for 2 or more years, more than 5 months per year.

9. Furthermore, the continuous service requirement in the Plan is an additional requirement similar to minimum or maximum age requirements, which may be valid in terms of limiting participation to the Plan but would not allow such employees to be excluded under the wording of Section 401(a)(3)(A) for determining the coverage requirements. Therefore, each corporation would have two or three eligible employees and only one, Myrna Myron, would have been covered so that the 70 percent coverage requirement was not met. See Rev.Rul. 73–265, *supra*, which states that an employee with over five years of service but not 60 months of continuous service may not be excluded for purpose of Section 401(a)(3)(A) coverage requirements.

10. Congress in passing Section 401(a)(3)(B), under which the corporations try to qualify the Plan, decreed that a pension plan could not be qualified under the alternative route there provided unless it was "found by the Secretary or his delegate not to be discriminatory." Thus, Congress entrusted to the Secretary the delicate task of weighing the multitude of variables which go into the make-up of a pension plan and determining whether the particular combination of variables employed in a given plan resulted in favoritism toward the prohibited groups. As the Second Circuit noted in C. I. R. v. Pepsi-Cola Niagara Bottling Corp., *supra*, 399 F.2d pp. 393–394, the provisions of Section 401(a)(3)(B), while not pre-

cluding meaningful judicial review, do "suggest an intention that the Commissioner's finding be given a shade more than its usual substantial weight." The court in John Duguid & Sons, Inc. v. United States, 278 F.Supp. 101 at p. 105 (N.D.N.Y., 1967) states its similar conclusion with regard to the Commissioner's finding of discrimination: "The make-up of the Statute obviously entrusts the analysis fundamentally to the expertise of the [Internal Revenue] Service."

In short, the evidence involving this issue draws the same conclusions as in John Duguid & Sons, Inc. v. United States, *supra*, where in holding that the Commissioner's determination that the operation of the plan was discriminatory was not arbitrary or an abuse of discretion. The Court stated (278 F.Supp. at 105):

> The hard, cold facts involved here are undisputed, and I so find them, that the three employees covered by the plan were the two owners and managers of the Company and its one Supervisor. It is true, as the government concedes, that by the statute and regulations a plan may cover salaried employees only, and there is no requirement to cover the entire labor force, but in this setting there is sufficient, I think, to base adverse decision upon the portion of the statute that bars approval if the plan favors officers, shareholders and persons whose principal duties consist in supervising the work of other employees, or are highly compensated employees. * * *

■ 11. The determination by the Commissioner of Internal Revenue in disallowing qualification of the Plan was not arbitrary, unreasonable or capricious. Loevsky v. Commissioner, 55 T.C. 1144 (1971), affirmed per curiam 471 F.2d 1178 (3d Cir., 1973), cert. denied

412 U.S. 919, 93 S.Ct. 2733, 37 L.Ed.2d 145 (1963); Ed & Jim Fleitz, Inc. v. Commissioner, 50 T.C. 384 (1968); John Duguid & Sons, Inc. v. United States, *supra*.

12. Plaintiff attempts to place great weight on the fact that the corporations requested and received an advance ruling from the District Director of Internal Revenue that the Plan was qualified. The Government submits that the ruling was valid only to the extent of the facts presented by the corporations at the time the ruling was requested. This is made quite clear by the Commissioner where he states (Rev.Rul. 69–24, 1969–1 Cum.Bull. 110, 111):

> A determination letter issued with respect to the qualification of a plan under section 401(a) of the Code, is based on the information furnished by the employer. (Citation omitted). The wording contained within the four corners of a written document may spell out a theoretically qualified plan which may or may not materialize in actual operation. * * * *[2]

■ 13. The law is settled that the advance ruling issued to Ballroom and Enterprises does not mean that the contributions by them to the Plan is ipso facto deductible or not includable in their employee's income. The propriety of the deduction or exclusion is dependent solely on the facts and circumstances existing at the time the contributions were made. John Duguid & Sons, Inc. v. United States, *supra*; Section 1.401.–1(b)(3) of the Treasury Regulations; Rev.Proc. 62–31, 1962–2 Cum.Bull. 517. This was made manifest to the corporations by the District Director in his determination letter to Ballroom and Enterprises.

■ 14. Plaintiff furthermore contends that her offer in 1969 to Internal Revenue Service representatives during the course of the audit to correct the al-

---

2. H.Rept. No. 2333, 77th Cong. 2d Sess. (1942), pp. 103, 104 states that, "In order to insure that stock bonus, pension, or profit-sharing plans are *operated* for the welfare of employees in general, and to prevent the trust device from being used for the benefit of shareholders, officials, or highly paid employees, * * * *" [Emphasis added.]

leged discrimination by a contribution into the Plan should have cured any defect for 1967 and 1968. In making such an argument, however, plaintiff ignores certain fundamental principles. Specifically, both Ballroom and Enterprises are on the accrual basis of accounting. Section 404(a)(6) of the Code provides that a taxpayer on the accrual basis shall be deemed to have made a payment on the last day of the year of accrual if the payment is made within the time prescribed by law for the filing of a return for such taxable year, provided that the trust to which the payment is made is a qualified trust. Where the plan is unqualified, Section 1.404(a)–12 of the Regulations states that no deduction is allowable under section 404(a)(5) for any contribution paid or accrued by an employer under a stock bonus, pension, profit-sharing, or annuity plan except in the year when paid, and then only to the extent allowable under section 404(a). *A fortiori*, it becomes axiomatic that in order for an employee to participate in a plan, there must first be a payment into that plan by the employer, subject of course to mathematical limitations. Here, the corporations made no payment into the Plan during the years in issue for those employees who should have been covered. Thus, although a payment covering all qualified employees could have been made into the Plan during 1969, or thereafter, such a payment could not have retroactively qualified the Plan during the years in issue.

15. The law provides that there are only two methods by which a retroactive cure can be made to a deferred compensation plan. The first method is under Section 401(b) which states *inter alia* that a deferred compensation plan can be amended to cure any discriminatory provisions only until the 15th day of the third month following the close of the employer's taxable year. However, Section 401(b) relates only to curing the form of the plan; here, it was the operational facet of the Plan which was discriminatory and, moreover, the discrimination existed well beyond the 2½

month time period. The second method is found under Statement of Procedural Rules, Internal Revenue Service, Section 601.201(1)(5)(26 C.F.R.) which states *inter alia* that no retroactive application of an Internal Revenue determination can be made where the taxpayer has made a misstatement or omission of material facts, or the facts which were subsequently developed were materially different from the facts on which the advance ruling was based. The demonstrated evidence in the instant action shows that neither standard has been met by Myron.

16. The failure of Ballroom and Enterprises to include five employees as participants under the Plan vitiates the very essence of the Congressional purpose underlying the qualification of a deferred compensation plan, namely, to provide for the general welfare of the employees.

17. In claiming that a payment in 1969 for all eligible employees could in some manner relate back to the years in issue, plaintiff relys on Time Oil Co. v. Commissioner, 258 F.2d 237, 238 (9th Cir., 1958). However, in that case not only were the variations from the plan "slight," but more importantly, there the court held that the deductions which the corporation claimed as payments had been "once approved." Here, no such deduction had ever been approved by the Commissioner—only the Plan was approved based upon assertions that, other then Myron and those employees covered under union-negotiated plans, the remaining employees were seasonal or part-time.

18. Even more significantly, plaintiff is attempting to elevate form over substance. Specifically, substantial prejudice resulted to those employees of Ballroom and Enterprises who should have been covered by payments to the Plan during the years in issue, but were not. There was a benefit enjoyed by not covering those employees—unfortunately for them, however, it inured only to Myron and her sole-owned corporations. This is true even though the

omitted employees were covered by contributions made to the Plan in 1973, said contributions being in an amount equal to the amounts which should have been contributed plus an amount for interest to make up for the period of time between 1967 and 1971, and further, even though Myron did not enjoy any immediate benefit under the Plan by reason of certain employees not being covered.

19. In this connection, the decision in *Time Oil Co.*, did not reverse the Tax Court decision per se—it was remanded on other grounds, and the Ninth Circuit later affirmed the Tax Court on another ground 294 F.2d 667 (9th Cir., 1961). This becomes manifest in the later Ninth Circuit case of Commissioner v. Sherwood Swan and Company Ltd., 352 F.2d 306 (1965), which affirmed the Tax Court (42 T.C. 299) for reasons stated therein. In the *Sherwood Swan* Tax Court decision, the facts showed that unlike the facts here, those employees of the taxpayer who were eligible under its plan were covered. Consequently, the Tax Court upheld the plan but in *doing* so held (42 T.C. pp. 306, 307–308):

It is the alteration of the effect of the provisions of a qualified and approved plan by administration and operation thereof in a manner which violates the fundamental purpose of Congress in enacting section 401 that gives rise to the respondent's right to declare a once approved plan no longer approved and tax exampt. *Time Oil Co.* 26 T.C. 1061, remanded on other grounds 258 F.2d 237 (C.A. 9).
\* \* \*

\* \* \* \* \* \*

We find no evidence of discrimination here and particularly none which results from administration and oper-

ation of the plan which amounts to an alteration of its intendments. *Time Oil Co., supra.*

20. In short, it was the corporations' own discriminatory practice of only covering Myron under the Plan which caused its disqualification—not by virtue of any reliance on the District Director's ruling. This is true even though at the time Myron inspected and signed the corporation income tax returns of Myron's Ballroom and Myron's Enterprises for the years in issue, she became legally responsible for the mistake in respect to the Plan even though she was actually not aware of the problem at the time of filing the subject corporations' income tax returns.

21. In conclusion, the payments made by the corporations in the total amount of $13,627.88 each during 1967 and 1968 constituted additional income as compensation for services to Myron for said years, and due to disqualification of the Plan, cannot be deferred. Section 402(b) of the 1954 Code.

22. Section 401(b) provides that retroactive correction of the Plan may be made only within the taxable year plus two and one-half months after the end of the taxable year, that provision referring only to the form of the Plan. Although there is no such expressed limitation in the Internal Revenue Code in respect to retroactive correction of operational defects of the Plan, there is no statutory authority for allowing such corrections.

23. The plaintiff is not entitled to prevail and the defendant is entitled to judgment in its favor.

24. Any findings of fact deemed to be a conclusion of law is hereby concluded as a matter of law.