QUALITY BRANDS, INC., PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

BEVERAGE SALES, INC., PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket Nos. 6797–74, 6798–74.   Filed November 8, 1976.

*Edwin K. Hunter* and *Winfield E. Little, Jr.,* for the petitioners.
*William A. Neilson,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined the following deficiencies in the petitioners' Federal corporate income taxes:

| Petitioner | Year ending June 30— | Deficiency |
|---|---|---|
| Quality Brands, Inc. | 1971 | $440.00 |
|  | 1972 | 440.00 |
| Beverage Sales, Inc. | 1971 | 880.00 |
|  | 1972 | 4,526.67 |

Most of the issues have been conceded; the two issues remaining for decision are: (1) Whether a profit-sharing plan established by the petitioners qualified in operation under section 401(a) of the Internal Revenue Code of 1954;[1] and (2) whether the petitioner, Beverage Sales, Inc., may deduct under section 162 the cost of changing its corporate name.

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Quality Brands, Inc. (Quality), is a Louisiana corporation whose principal place of business was in Lafayette, La., at the time it filed the petition herein. It filed its Federal corporate income tax returns for the taxable years ending June 30, 1971, and June 30, 1972, with the Internal Revenue Service Center, Austin, Tex. Quality was formerly named Pearl Beer Distributing Co. of Lafayette, Inc.

The petitioner, Beverage Sales, Inc. (Beverage), is a Louisiana corporation whose principal place of business was in Lake Charles, La., at the time it filed the petition herein. It filed its Federal corporate income tax returns for the taxable years ending June 30, 1971, and June 30, 1972, with the Internal Revenue Service Center, Austin, Tex. During its taxable year ending in 1972, Beverage changed its name from Pearl Beer Distributing Co. of Lake Charles, Inc., because it was increasingly selling beverages other than beer.

Sammy Abraham was at all times relevant hereto the president of Quality and its sole shareholder. During the years in issue, George Abraham was the president of Beverage.

On June 30, 1968, Quality and Beverage entered into a trust agreement with George Abraham, Sammy Abraham, and Gus W. Schram, Jr., who agreed to serve as trustees of a profit-sharing trust (trust) which was to be administered in accordance with the plan set forth in the agreement. The trustees were authorized to interpret and determine all questions arising under the plan and to act by a vote of two of them. All full-time employees were eligible to participate in the plan. An account was established for each participant, and:

Contributions shall be allocated to the account of participants on a credit basis:

One credit being given for each full $100 compensation.

Initially, the credits allocated in the first year shall be considered trust units each having an equal value.

Subsequently, each year the trust fund shall be adjusted to the current market value of its holdings * * * and each unit shall reflect this change in value or income.

After the allocation of amounts have [sic] been made to each participant for the current year's contribution under the credit basis, each participant shall receive as many trust units as his allocation amount shall indicate * * *

The full value of a participant's account was distributable in the event of his reaching retirement age of 65, his death, or his becoming totally disabled. If a participant's employment was terminated for any other reason, the vested units in his account were distributable, and the units not vested were forfeited. Vesting was graduated, increasing with the length of an employee's participation in the plan in accordance with the following schedule:

| Completed years of participation | Percentage of units vested | Completed years of participation | Percentage of units vested |
|---|---|---|---|
| 1 | 0 | 8 | 50 |
| 2 | 5 | 9 | 60 |
| 3 | 10 | 10 | 70 |
| 4 | 15 | 11 | 80 |
| 5 | 20 | 12 | 90 |
| 6 | 30 | 13 | 100 |
| 7 | 40 | | |

On September 16, 1968, the petitioners sent a letter to the Internal Revenue Service, New Orleans, La., in which they requested a determination that the plan was qualified under section 401(a) and that contributions by the petitioners to the trust would be deductible under section 404(a). In a letter dated February 25, 1969, the IRS replied to the petitioners' request and informed them that before a determination could be made additional information or clarification was needed. In part, the letter suggested that some clarification was needed in the provisions relating to disposition of forfeitures. The IRS also stated that they would withhold further action on the plan for a period of 15 days so that the petitioners could comply with the suggestions in the letter. On May 12, 1969, the IRS sent the petitioners another letter which informed them that the request for a determination concerning the qualified status of their profit-sharing plan would be considered withdrawn, since the requested information and clarification was not sent in. As of the date of the trial in this case, the IRS had issued no determination with respect to the qualification of the petitioners' profit-sharing plan.

During its taxable year ending in 1971, some employees of Quality, who were participants in its profit-sharing plan, terminated their employment for reasons other than retirement, death, or total and permanent disability. In their taxable years ending in 1972, both petitioners experienced such employee terminations. Whenever such a termination occurred, the trustees of the trust forfeited that employee's entire account, including the vested portion. The following chart sets forth the accounts of the employees which were forfeited and the percentage thereof which was vested:

| Participant | Whole share | Percent vested |
|---|---|---|
| *Quality Brands—1971* | | |
| R. Credeur | $616.51 | 10 |
| A. Morgan | 366.26 | 10 |
| K. LeBlanc | 44.94 | 0 |
| J. Veillon | 18.60 | 0 |
| Total | 1,046.31 | |
| *Quality Brands—1972* | | |
| D. Hebert | $806.41 | 15 |
| W. Seaux | 338.89 | 5 |
| R. Davidson | 80.81 | 0 |
| R. Allen | 53.88 | 0 |
| G. Ashy | 59.25 | 0 |
| J. Stelly | 35.01 | 0 |
| Total | 1,374.25 | |
| *Beverage Sales—1972* | | |
| J. Deshotel | $1,049.38 | 15 |

During the years in issue, the forfeitures were reallocated to the remaining plan participants of each petitioner in accordance with their total units earned under the plan to the date of the reallocation. The following chart sets forth the amount of compensation of the president and other employees of each petitioner, the amount of forfeitures allocated to them, and the percentage which such allocation bears to their current compensation:

| Participants | Compensation | Forfeitures allocated | Percentage |
|---|---|---|---|
| *Quality Brands—1971* | | | |
| Sammy Abraham | $20,700.00 | $313.88 | 1.516 |
| All other participants other than Mr. Hebert[1] | 62,086.72 | 626.57 | 1.009 |
| *Quality Brands—1972* | | | |
| Sammy Abraham | $23,900.00 | $484.64 | 2.027 |
| All other participants | 54,607.00 | 889.61 | 1.629 |

| *Beverage Sales—1972* | | | |
|---|---|---|---|
| George Abraham | $24,000.00 | $235.38 | .981 |
| All other participants | 128,681.83 | 814.00 | .633 |

[1] Mr. Hebert is excluded from the computation because his salary in 1971, $475, is so disproportionate with his previous earnings—$7,920 in 1970—that the allocation to his account represents 21.654 percent of his current compensation. However, even if Mr. Hebert's compensation is considered in connection with all of the other participants, then the forfeitures allocated to all other employees, measured as a percent of their compensation, increases only slightly to 1.170 percent.

The petitioners, on their 1971 and 1972 Federal corporate income tax returns, deducted their contributions to their profit-sharing trust. In addition, Beverage deducted, as an ordinary and necessary business expense, the cost of changing its name. The Commissioner, in his notices of deficiency, disallowed the petitioners' contributions to the profit-sharing trust on the ground that the forfeitures were reallocated in such a manner as to cause the plan to be discriminatory in its operations under section 401(a)(4). The Commissioner also disallowed Beverage's deduction of the cost of changing its name. Various other adjustments made by the Commissioner have been conceded by the petitioners.

### OPINION

The first issue we must decide is whether the contributions by the petitioners to their employees' profit-sharing trust are deductible under section 404(a). Section 404(a) allows an employer a limited deduction for contributions made to or under a profit-sharing plan if the contributions are ordinary and necessary business expenses under section 162 and if the profit-sharing trust is exempt under section 501(a). Section 401(a) sets forth the requirements a profit-sharing trust must meet to qualify for exemption under section 501(a). Thus, in this case, the deductibility of the petitioners' contributions turns on whether their profit-sharing plan qualifies under section 401(a).

The Commissioner takes the position that during the years in issue, the petitioners' profit-sharing plan did not qualify under section 401(a), and he presents several grounds in support of his position, one of which is that the forfeitures were reallocated in such a manner as to violate section 401(a)(4). In relevant part, such provision states:

A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

\* \* \*

(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees.

The Commissioner argues that when the amount of forfeitures allocated to the officers of each of the petitioners is compared with the amount of such forfeitures allocated to the other employees, there was discrimination in favor of such officers, one of the prohibited groups within the meaning of section 401(a)(4). A plan fails to qualify under section 401(a)(4) if it discriminates in favor of any of the prohibited groups. *Bernard McMenamy, Contractor, Inc.,* 54 T.C. 1057 (1970), affd. 442 F.2d 359 (8th Cir. 1971). In view of our decision with respect to this issue, we need not consider the other grounds presented by the Commissioner.

In a profit-sharing plan which does qualify under section 401(a), contributions and forfeitures may be allocated on the basis of total compensation (sec. 401(a)(5)), and in allocating contributions and forfeitures, years of service may be taken into consideration (sec. 1.401–4(a)(2)(iii), Income Tax Regs.; *Bernard McMenamy, Contractor, Inc., supra*). However, an allocation formula which takes into consideration the length of an employee's service will cause a plan not to qualify under section 401(a) if, by reason of the inclusion of such factor, the amounts allocated to members of a prohibited group, when measured as a percentage of current compensation, are disproportionately higher than the amounts allocated to other employees. See *Auner v. United States,* 440 F.2d 516 (7th Cir. 1971); *Bernard McMenamy, Contractor, Inc., supra;* see also *Liberty Machine Works, Inc.,* 62 T.C. 621 (1974), affd. per curiam 518 F.2d 554 (8th Cir. 1975); *Loper Sheet Metal, Inc.,* 53 T.C. 385 (1969). In *McMenamy,* the formula for allocating contributions to a profit-sharing plan took into consideration compensation and years of service. The amounts so allocated to the account of the president and sole shareholder of the employer constituted, respectively, 11.35, 12.51, 18.67, and 18.88 percent of his compensation for the years 1961 through

1964. However, during that same period, the contributions for all other employees, computed as a percentage of their compensation, were, respectively, 8.59, 9.47, 13.94, and 14.10 percent. In other words, the contributions to the president and sole shareholder, when computed as a percentage of his compensation, were approximately 30 percent greater in each year than were the corresponding percentages for all other plan participants.

Here, forfeitures were reallocated on the basis of a participant's total units in the trust, so that such formula, in effect, took into consideration the length of an employee's service. We find that the use of such formula resulted in as great a disparity in the allocation of forfeitures in favor of the presidents of the petitioners as we found in *McMenamy* with respect to the allocation of contributions. See also *Auner v. United States, supra.* In 1971, the forfeitures allocated to the account of Quality's president constituted 1.516 percent of his compensation; whereas, if all employees except Mr. Hebert are considered, such percentage for all other employees is only 1.009. In other words, the percentage for Sammy Abraham is 50.24 percent greater than that of the other employees. Even if Mr. Hebert is considered together with the other employees, the percentage for Sammy Abraham is still 29.57 percent greater than that for the other employees. In 1972, the forfeitures allocated to Sammy Abraham's account represented 2.027 percent of his current compensation; whereas, such percentage for the other employees was only 1.629. Thus, the percentage for Sammy Abraham was 24.610 percent greater than the percentage for all other employees. In 1971, there were no forfeitures to be allocated with respect to the employees of Beverage, but in 1972, the percentage allocated to the account of George Abraham, its president, exceeded by 54.82 percent the percentage allocated to the accounts of all other employees.

The amounts of forfeitures reallocated in the years at issue were relatively small, but since the formula used for allocating them resulted in a consistent pattern, of favoring the presidents of the petitioners, we find and hold that Quality's plan was discriminatory in its operation for 1971 and 1972 and that Beverage's plan was discriminatory in operation for 1972. However, since there were no forfeitures

to be allocated with respect to the employees of Beverage in 1971, and since the Commissioner has raised no other objections with respect to its plan for that year, we hold that there was no discrimination in the operation of its plan for that year.

The petitioners do not dispute that the forfeitures were allocated in such a manner as to favor their officers; instead, they argue that the allocations were "bookkeeping errors" and that they should be allowed to readjust the accounts. The forfeiture of the vested portions of a terminated employee's account may have been due to carelessness on the part of the trustees, but by far, the larger portion of the forfeitures resulted from the nonvested portions of the employees' accounts. The plan was unclear as to how forfeitures were to be allocated, and since the trustees had the authority and responsibility of interpreting and administering the plan, they were authorized to decide how to allocate the forfeiture of the nonvested accounts. There is no basis for contending that their actions in that respect were due to bookkeeping errors and should be readjusted. Under the plan, they had the authority to allocate the nonvested portions of accounts, and they did so in such a manner as to favor the officers of the petitioners. Since most of the discrimination was thus authorized by the plan, there is no basis for saying that it was due to mere bookkeeping errors, and we need not decide whether or when discrimination due to bookkeeping errors may subsequently be corrected.

Next, the petitioners argue that the discrimination in this case resulted from the actions of the trustees and that a plan should not be disqualified because of the actions of independent trustees. First of all, there has been no showing that the trustees in this case were in fact independent. Two of them, a majority and enough to decide upon any action by them, were the presidents of the two petitioners and the beneficiaries of the discrimination. It is difficult to see how such individuals could be found to be independent trustees. Moreover, we have found that most of the discrimination resulted from the forfeitures of nonvested accounts, actions which under the plan the trustees were authorized to take. In judging the qualification of a plan, we must consider not only its terms but also its operations. See sec. 1.401–1(b)(3), Income Tax

Regs.; *Cornell-Young Co. v. United States,* 469 F.2d 1318, 1324 (5th Cir. 1972); *Greenwald v. Commissioner,* 366 F.2d 538, 540 (2d Cir. 1966), affg. on this issue 44 T.C. 137 (1965); *Duguid & Sons, Inc. v. United States,* 278 F.Supp. 101, 106 (N.D. N.Y. 1967). The manner of reallocating forfeitures may be the basis for disqualifying a plan (sec. 1.401–4 (a)(1)(iii), Income Tax Regs.), and since, in the case of a trust, it is the trustees who must reallocate the forfeitures, it follows that their actions must be taken into consideration in determining whether the plan qualifies in operation. Thus, if we consider only the plan and the authorized actions of the trustees, it is clear that there has been such discrimination as to cause the plan to fail to qualify. In addition, since the unauthorized forfeitures were used to benefit members of a prohibited group, such actions by the trustees should also be considered in judging the qualification of the plan, and they reinforce our conclusion. See *Time Oil Co.,* 26 T.C. 1061 (1956), remanded on another issue 258 F.2d 237 (9th Cir. 1958); *Myron v. United States,* 382 F.Supp. 590 (C.D. Cal. 1974).

Finally, the petitioners suggest that they are willing to reconstruct the accounts in the profit-sharing plan to eliminate the prohibited discrimination and that they are willing to pay to all terminated employees the vested portions of their accounts. They argue that such actions should be given retroactive effect, and they claim that *Aero Rental,* 64 T.C. 331 (1975), supports their position. However, this situation is altogether different from that in *Aero Rental,* in which there had been no discrimination in the operation of the plan and in which, with due diligence, the plan had been amended retroactively to eliminate all objectionable provisions prior to the action in this Court. In the case before us, the plan allowed the trustees to administer it in a discriminatory manner, and even though the IRS suggested clarification of the provisions relating to reallocation of forfeitures, no efforts have been made to amend the plan. Moreover, here, the plans have been operated in a manner so as to discriminate in favor of a prohibited group. Under these circumstances, there is no authority for permitting the petitioners to change retroactively what has been done in order to qualify the plan. See also *Myron v. United States, supra;* cf. sec. 401(b).

The next issue we must decide is whether the costs incurred by Beverage for the purpose of changing its corporate name are deductible under section 162. The petitioners, in their brief, state that this issue still remains to be decided, but they have presented no argument therein in support of their position. In any event, there is absolutely no merit to their position. The Eighth Circuit has stated the well-settled rule:

Expenses incurred by [a] taxpayer in changing its name were expenditures made in connection with acquiring a capital asset, and, hence, not deductible as ordinary and necessary business expenses. A trade name or business name is a capital asset. 3B Mertens, Law of Federal Income Taxation, (1966 Rev.) §22.49. See Ranier Brewing Co. v. Commissioner, 7 T.C. 162 (1946), aff'd 165 F.2d 217 (9 Cir. 1948) * * * [*United States v. General Bancshares Corp.,* 388 F.2d 184, 192 (8th Cir. 1968).]

Therefore, we hold that Beverage may not deduct as an ordinary and necessary business expense the costs it incurred in changing its name.

*Decision will be entered for the respondent in docket No. 6797–74.*

*Decision will be entered under Rule 155 in docket No. 6798–74.*