469 F.2d 1318
 73-1 USTC P 9107
 CORNELL-YOUNG COMPANY, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
MACON PRESTRESSED CONCRETE COMPANY, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 72-1299.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 5, 1972.
 
 Charles M. Cork, Sr., Charles M. Cork, Jr., George T. Williams, Macon, Ga., for plaintiff-appellant.
 William J. Schloth, U. S. Atty., Macon, Ga., Scott P. Crampton, Asst. Atty. Gen., Tax Div., Meyer Rothwacks, Atty., Michael L. Paup, Dept. of Justice, Washington, D. C., for defendant-appellee.
 Before COLEMAN, GOLDBERG, and GODBOLD, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 "Neither the [Internal Revenue] Code nor Regulations issued thereunder contain any requirement that as a condition precedent for obtaining the tax benefits incident and pertaining to qualified employees [pension] plans an advance ruling as to initial qualification or termination must be obtained from the Internal Revenue Service. Such an advance ruling is issued only on request of a taxpayer and is not initiated by the Internal Revenue Service without such a request. In reality, therefore, the granting or issuing of an advance ruling is a matter of convenience . . . As a matter of practice, however, it is unusual for an employees' plan to be put into effect without a ruling issued in advance of at least the time when the return would be due were the employees' trust not exempt from tax."
 
 
 2
 -4A Mertens Law of Federal Income Taxation Sec. 25B.20 at 85-86.
 
 
 3
 This appeal is just such an "unusual" case. Taxpayers are two Georgia corporations[1] that in 1960 elected to adopt an employee pension plan without first obtaining a ruling as to whether the plan would be "qualified" within the meaning of section 401(a) of the Internal Revenue Code of 1954. The plan was put into effect[2] and both companies subsequently claimed deductions under section 404 of the Code. The Commissioner of Internal Revenue disallowed the deductions and assessed income tax deficiencies against both companies.[3] Taxpayers paid the deficiencies under protest and brought these consolidated suits for a refund.
 
 
 4
 The sole issue presented in both cases is whether the taxpayers' employee pension plan "qualified" under section 401 (a) of the Code. If it did, taxpayers had the right to take deductions under section 404 and are entitled to their refund. The court below found that on the briefs, stipulated facts, and documentary evidence the plan did not so qualify and therefore entered judgment for the United States. We affirm, and in so doing we feel that we can add little to the well-reasoned opinion that was entered below. Accordingly, we here rely heavily on Judge Bootle's district court opinion, utilizing his insightful language beyond the point of plagiarism, adding to it and altering it only where necessary to answer arguments advanced on appeal.
 
 I. THE PENSION PLAN
 
 5
 The plan implemented by taxpayers is not complex. Membership in the program was limited to those employees of both companies who were (1) salaried, as opposed to hourly-paid, employees; (2) earning over $4,800 per year; (3) employed continuously for five years immediately prior to January 1, 1960, or January 1 of any subsequent year; and (4) at least 25 but less than 60 years of age. Future employees would be eligible for participation in the plan only if they were (1) salaried; (2) earning in excess of $4,800 per year; (3) employed five years prior to the January 1st anniversary date of the plan; and (4) at least 25 but less than 55 years of age.
 
 
 6
 The retirement annuity of each member of the plan is computed as follows: (1) the basic salary, exclusive of overtime and bonuses, shall be divided by 12; (2) which result shall be mutliplied by 30 percent; and (3) from that result there shall be deducted the amount of monthly benefits that the member would have been entitled to receive under the Federal Old Age, Survivors, and Disability Insurance Benefits law if he had been fully insured and entitled to receive benefits on January 1, 1960 (or in the case of future members, on the date he became a member of the plan), and if his average salary for computing such benefits were the same as his basic compensation for the purpose of determining his retirement annuity. In no event was the monthly benefit to any member to have been less than $20, although the monthly retirement annuity could be greater if justified as set out above. In addition, the trust agreement limited the maximum amount of benefits to be provided by the companies' contributions.
 
 
 7
 For the years 1960 through 1965 the total employment of taxpayers broken down into pay categories is shown in the following table, which also indicates the number of employees who were qualified to receive benefits under the plan:
 
 
 8
 Cornel Young Company 1960 1961 1962 1963 1964 1965
-------------------------------------------------------------------------------
Hourly paid employees 97 142 86 88 144 142
Salaried employees 21 21 18 20 18 19
 ---- ---- ---- ---- ---- ----
Total 118 163 104 108 164 161
-------------------------------------------------------------------------------
Employees covered by pension plan Macon 12 12 11 11 11 9
 Prestressed Concrete Company
-------------------------------------------------------------------------------
Hourly paid employees 59 94 94 146 219 192
Salaried employees 4 5 4 8 15 19
 ---- ---- ---- ---- ---- ----
Total 63 99 98 152 234 211
-------------------------------------------------------------------------------
Employees covered by pension plan 3 2 2 3 5 7
 
 
 9
 For the years 1960 and 1961, of the 12 Cornell-Young employees actually covered by the plan, 11 were either officers, shareholders, persons with principally supervisory duties, or highly compensated employees:
 
 
 10
 Name Job Description
1. G. P. Jones Vice President, Shareholder
2. R. M. Young Vice President, Shareholder
3. W. L. Young Vice President, Shareholder
4. Roby H. Costa Secretary-Treasurer
5. John A. Arnold Superintendent
6. Henry W. Avery Superintendent
7. A. S. Callaway Superintendent
8. F. B. Miller Superintendent
9. Carl O. Curry Foreman
10. J. A. Strickland Foreman
11. W. A. McNeil Head Mechanic
 
 
 11
 The only person covered by the plan in 1960-1961 who was not a member of the upper-echelon group was Osborn A. Smith, a mechanic. Smith, however, terminated his employment with Cornell-Young in 1961, so the 11 listed employees were the only ones covered by the plan during 1962, 1963, and 1964. In 1965 only 9 of the listed employees were covered, Miller and Strickland having transferred to Macon Prestressed Concrete Company.
 
 
 12
 Operation of the plan at Macon Prestressed Concrete produced similar figures during the taxable years in issue. During 1960, of the 3 employees covered, two were G. Paul Jones, Jr., a vice-president/shareholder, and W. H. Brightwell, the plant superintendent. The one employee covered by the plan in 1960 who was not a member of the upper-echelon group was V. D. Moreloth, a mechanic. Moreloth, however, terminated his employment, so during 1961 and 1962 only Jones and Brightwell were covered by the plan. In 1963, J. W. Kull, a foreman, came under the plan, although a stipulated exhibit demonstrated his salary was only $3,137.10-far below the stated minimum salary of $4,800. Thus, in 1964 the 5 employees covered by the plan were:
 
 
 13
 Name Job Description
W. H. Brightwell Plant Superintendent
G. Paul Jones, Jr. Vice President
J. W. Kull Foreman
F. B. Miller (transferred from Cornell to Macon) Foreman
J. A. Strickland (transferred from Cornell to Macon) Foreman
 
 
 14
 In 1965, W. K. Morgan, a mechanic, and W. C. Boswell, an engineer, were added to the list of Macon employees covered by the plan.
 
 
 15
 These statistics vividly demonstrate how the plan actually operated. Of the Cornell-Young employees, only one member of the plan during the years 1960 through 1965 was not an officer, shareholder, supervisor, or other highly compensated employee. The one exception was a member for but one year. The Macon statistics carry with them the same obvious implication that the plan operates to the almost total exclusion of lower-echelon employees.
 
 
 16
 II. QUALIFICATION OF A PLAN UNDER SECTION 401(a)(3)(A)
 
 
 17
 Section 401(a)(3) of the Code prescribes two alternative methods for qualifying an employees' plan. The first, set forth in subparagraph (A), demands coverage of at least 70 percent of the employees or, if at least 70 percent of the employees are eligible to participate, actual coverage of 80 percent of these satisfies this requirement.[4] In addition, the other requirements of section 401(a) must be satisfied if the plan is to qualify by the "percentage method." Here, however, taxpayers concede that their plan cannot qualify under section 401(a)(3)(A). They must therefore pursue another route to qualification if they are to be entitled to their deductions and refund.
 
 
 18
 III. QUALIFICATION OF A PLAN UNDER SECTION 401(a)(3)(B)
 
 
 19
 Section 401(a)(3) allows to qualify under subparagraph (B) a plan "set up by the employer and found by the Secretary or his delegate not to be discriminatory in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees" [emphasis added]. As noted by Judge Bootle, while the use of the phrase "found by the" Commissioner, Sec. 401(a)(3)(B), "does not preclude meaningful judicial review, it does suggest an intention that the Commissioner's finding be given a shade more than its usual substantial weight." C.I.R. v. Pepsi-Cola Niagara Bottling Corp., 2 Cir. 1968, 399 F.2d 390, 393. Thus, the starting point in analyzing whether the taxpayers here can qualify their plan under subparagraph (B) is recognition that taxpayers have not satisfied the statute on its face-they have not had their plan "found by the Secretary or his delegate not to be discriminatory". The ultimate issue is whether we can reverse the Commissioner's affirmative finding that this plan in fact discriminates in favor of the prohibited group.
 
 
 20
 The government insists that the standard for review of the Commissioner's decision places the burden on taxpayers to show that the administrative decision was "arbitrary, unreasonable, or capricious."[5] Taxpayers argue that "the only standard of review this court has to follow is one of the applying the law [de novo] to the stipulated facts." We need not and do not decide if either is a correct statement of the law, for on the facts of this case we find that the Commissioner's finding should not be disturbed, regardless of the standard for review utilized.
 
 
 21
 To qualify under section 401 (a) of the Code, a plan must, in addition to satisfying all other statutory requirements, benefit employees in general, not just those who are officers, shareholders, supervisors, or highly compensated employees. In determining whether a pension plan is for the exclusive benefit of employees in general, all of the surrounding and attendant circumstances and all of the details of the plan will be considered. See Treas.Reg. Sec. 1.401(b)(3). In making this determination, the law looks not only to the form of the plan but also to its operation. See Duguid & Sons, Inc. v. United States, N.D.N.Y.1967, 278 F.Supp. 101, 106; Rev.Rul. 61-157, part 4(i); 4A Mertens, Law of Federal Income Taxation Sec. 25B.15 at 53.
 
 
 22
 During the period here under consideration, Cornell-Young employed from a low of 104 to a high of 163 persons; the maximum number of employees ever covered by the plan, however, was 12. And of these 12, only 1 was not a member of the prohibited group, and he was a member of the plan only during 1960-1961. From 1960 to 1965 Macon's number of employees ranged from 63 to 234, yet only a maximum of 7 were ever covered by the plan. Of these 7, 6 were either officers, shareholders, supervisors, or highly paid employees. In light of these facts, we fail to see how the argument can rationally be made that the Commissioner's finding-that this plan discriminated in favor of the upperechelon group-can be held "wrong" under any conceivable standard.
 
 
 23
 Furthermore, we note that although the Code and regulations and rulings promulgated thereunder explicitly provide that several of the features of the instant plan do not ipso facto render a plan discriminatory, this does not mean that a plan containing these features cannot be found to be discriminatory. For example, the first sentence of section 401(a)(5) of the Code states that a classification of employees shall not be considered discriminatory merely because it excludes non-salaried employees.[6] But classifications that exclude certain designated employees from coverage under the plan cannot be "not discriminatory" if the classifications result in covering almost exclusively only those employees in whose favor discrimination is prohibited.
 
 
 24
 "[The taxpayers'] case is not aided by Sec. 401(a)(5). While that subsection says that a plan shall not be considered discriminatory 'merely because it is limited to salaried or clerical employees,' this is quite different from saying that no plan covering all salaried employees can be discriminatory.See Fleitz v. C. I. R., 50 T.C. No. 35 (1968)."
 
 
 25
 C. I. R. v. Pepsi-Cola Niagara Bottling Corp., 2 Cir. 1968, 399 F.2d 390, 394. See also Rev.Rul. 66-13, 66-14.
 
 
 26
 Clearly the Code and Treasury Regulations permit some classifications in employee pension plans similar to those here under consideration, provided that the actual operation of the plan benefits employees in general. Treas.Reg. Sec. 1.401(b)(3). We agree with the court in Duguid & Sons, Inc. v. United States, supra, 278 F.Supp. at 104:
 
 
 27
 "Despite these favorable impressions for the cause of the plaintiff, I cannot escape the compelling and clear language in the statute and Treasury Regulations (26 C.F.R. Sections 1401-1, 3, 4) that direct the Secretary and his delegate in the determination for qualifying a pension plan to find the classification of employees in the plan not to be discriminatory. Such discrimination is spelled out by the phrase that the plan shall not favor employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees. In my judgment, the decision of the Director challenged that there was such discrimination is supported logically as well as legally by the admitted factual situation. The make-up of the Statute obviously entrusts the analysis fundamentally to the expertise of the Service. Plain, obvious and rational meaning of a Statute is always preferred to any curious, narrow, hidden sense. (Lynch v. Alworth-Stephens Co., 267 U.S. 364, 370, 45 S.Ct. 274, 69 L.Ed. 660; Old Colony R. R. Co. v. Commissioner of Internal Revenue, 284 U.S. 552, 52 S.Ct. 211, 76 L.Ed. 484)."
 
 
 28
 We agree with Judge Bootle that the Commissioner could have found that the cumulative effect of the classification contained in the instant plan was to favor the group of employees whom no qualified plan can discriminatorily favor under section 401(a)(3)(B). Even though the classifications adopted may be individually authorized by separate provisions of the tax laws, the plan clearly did not favor employees in general and it clearly discriminated in favor of the prohibited group. The plan thus fails to qualify under section 401(a)(3) (B).
 
 
 29
 IV. "SAVING" A PLAN THAT OTHERWISE FAILS TO QUALIFY BY INTEGRATING IT WITH SOCIAL SECURITY
 
 
 30
 Taxpayers next urge that even if their plan cannot qualify under sections 401(a)(3)(A) or 401(a)(3)(B), they nevertheless are entitled to their deduction because the plan "benefits employees in general" when OASI benefits to employees are considered. Taxpayers are correct that, as a general legal proposition, "integration" of a private plan with OASI, so that the private plan supplements social security law benefits to employees, can sometimes "save" a plan that would not otherwise qualify. See Mim. 6641, 1951-1 Cum.Bull. 41, amended by Rev.Rul. 61-75, 1961-1 Cum.Bull. 140. See also Treas.Reg. Sec. 1.401-3(e); Goldstein, Integrating Pension & Profit-Sharing Plan with Social Security, 15 N.Y.U. Inst. on Fed.Tax. 1165 (1957); 4A Mertens, Law of Federal Income Taxation Sec. 25B.16 at 60-67. But we conclude that taxpayers' reliance on integration is misplaced.
 
 
 31
 We think it apparent that integration "saves" only those features of a plan that seem to discriminate by excluding those earning less than the OASI base wage. See Int.Rev.Code of 1954, Sec. 401 (a)(5). Thus, that those of taxpayers' employees earning less than $4,800 per year are excluded for that reason is not objectionable; those employees benefit from the social security law pro rata up to the $4,800 level, and employees coming under the plan apparently do not receive private plan benefits on the first $4,800 of their wages. We find, however, that integration becomes a factor only when there is no other discriminatory feature on the basis of which the Commissioner might deny the plan qualification.[7] See 4A Mertens, Law of Federal Income Taxation Sec. 25B.16 at 63. Here the Commissioner had both the plan and its operational history before him. He concluded that the plan, which aside from limiting coverage to those earning over $4,800, also excluded hourly-paid employees, those employed less than five years, and employees under 25 or over 55 years of age, did in fact, in its total effect, discriminate in favor of the prohibited group. We are unwilling on the facts of this case to say that that determination was in any way erroneous or unjustified. See Bernard McMenamy Contractor, Inc. v. C. I. R., 8 Cir. 1971, 442 F.2d 359; Auner v. United States, 7 Cir. 1971, 440 F.2d 516.
 
 
 32
 Taxpayers have not brought their plan within the provisions of section 401(a) of the Code, and we are satisfied that the Commissioner's refusal to find that the plan is sufficiently integrated with social security programs to render it non-discriminatory is not erroneous under any standard of appellate review. Because taxpayers' plan does not "qualify," they are not entitled to take deductions under section 404.
 
 
 33
 In dissecting a pension plan, each part may be found to be letter perfect. The Commissioner, however, is directed to take a synoptic view to determine if the whole is discriminatory. A discriminatory whole might well exist even though it consists of flawless parts. The Commissioner is not, after all, a pension plan automaton with a statutory checklist that he can mechanistically apply to every case. Even if a plan checks out, if its circulation is directed primarily towards the head, with only minor seepages downward, the Commissioner can, and should, declare the plan thrombotic.
 
 
 34
 Affirmed.
 
 
 
 [1]
 Cornell-Young Company was incorporated in 1950 and is engaged in the manufacture and sale of ready-mixed concrete. Macon Prestressed Concrete Company was incorporated in 1957, is a wholly owned subsidiary of Cornell-Young, and is engaged in the manufacture of prestressed concrete
 
 
 [2]
 On May 24, 1960, the stockholders and boards of directors of both companies approved the adoption of a retirement plan for their employees. The trust agreement that was subsequently executed with a local bank was effective as of January 1, 1960
 
 
 [3]
 The tax consequences of the Commissioner's disallowing the deductions were as follows:
 Taxable Deduction Deficiency Interest Total
 Year Disallowed Assessed Additional
 Assessment
 Cornell-Young 1958 $6,526.26 $2,241.46 $8,767.72
 
 
 *
 
 1961 $12,550.51
 1962 12,179.03 3,528.54 951.30 4,479.84
 1963 12,448.05 6,105.63 1,279.75 7,385.38
 1964 15,269.00 7,675.96 1,148.34 8,824.30
 1965 5,969.83 2,865.52 256.76 3,122.28
 ------------- --------- -------------
 TOTALS: $26,701.91 $5,877.61 $32,579.52
 Macon 1963 $534.51 $282.63 $59.24 $341.87
 1964 1,652.76 826.38 123.63 950.01
 1965 2,476.67 1,188.81 106.52 1,295.33
 ------------- --------- -------------
 TOTALS: $2,297.82 $289.39 $2,587.21
 
 
 *
 The disallowance of Cornell-Young's 1961 deduction resulted in a reduction of a net-loss carryback for 1958
 
 
 [4]
 Under both percentage methods, the following are excluded from consideration: all employees "who have been employed not more than a minimum period prescribed by the plan, not exceeding 5 years, employees whose customary employment is for not more than 20 hours in any one week, and employees whose customary employment is for not more than 5 months in any calendar year." Int.Rev. Code of 1954, Sec. 401(a)(3)(A)
 
 
 [5]
 The government's brief cites in support of this proposition Loevsky v. Commissioner, 1971, 55 T.C. 1144, appeal pending; Ed & Jim Fleitz, Inc. v. Commissioner, 1968, 50 T.C. 384; John Duguid & Sons, Inc. v. United States, N.D. N.Y.1967, 278 F.Supp. 101
 
 
 [6]
 Even if each individual feature of taxpayers' plan would not alone justify the finding that the plan is discriminatory, taxpayers do not necessarily qualify their plan. We do not think that we could preclude the Commissioner, entrusted as he is by section 401(a)(3)(B) with the power to determine whether a plan is discriminatory when it does not satisfy section 401(a)(3)(A)'s percentage requirements, from ever finding that the cumulative effect of several such provisions renders a plan discriminatory
 
 
 [7]
 The government's brief insists that even if the integration approach is applied to the instant plan, it is not saved for the following reasons: (1) taxpayers failed to comply with the strict integration procedural/computational factors set out in Mim. 6641, 1951-1 Cum.Bull. 41 et seq.; (2) the plan provides life insurance protection to members, which OASI beneficiaries do not receive; and (3) the plan gives full benefits to member-employees even if they have been employed less than 15 years, which OASI does not, and thus only a sliding scale schedule of plan benefits could be the equivalent of OASI, citing Mim. 6641, supra, p 8. In addition, the government points to 1 member of the prohibited group who comes under the plan but who would not qualify if he were a future lower-echelon employee even if he met all other requirements. In essence, the government argues that these factors reveal that the sum of benefits flowing to the elite group was relatively and proportionately higher than that flowing to the excluded employees. When he refused to characterize the plan as nondiscriminatory, the Commissioner impliedly reached the same conclusion