FRED H. JOBUSCH AND JOSEPHINE B. JOBUSCH, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3429-74—3431-74. Filed September 19, 1977.

[1] Cases of the following petitioners are consolidated herewith: Bernard J. Friedman and Irma R. Friedman, docket No. 3430-74; Friedman & Jobusch Architects & Engineers, Inc., docket No. 3431-74.

*Arthur P. Allsworth* and *Richard C. Smith,* for the petitioners.

*Richard A. Jones,* for the respondent.

Wiles, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income tax:

| Year | Docket No. 3429–74 | Docket No. 3430–74 | Docket No. 3431–74[2] |
|------|-----|-----|-----|
| 1968 | $8,234.89 | $7,969.60 | $1,579.14 |
| 1969 | 4,726.99 | 4,898.50 | 23,724.39 |
| 1970 | 20,970.46 | 20,541.52 | 20,772.07 |

---

[2] Friedman & Jobusch Architects & Engineers, Inc., docket No. 3431–74, reports its income on a fiscal year ending June 30. The remaining petitioners report their income on a calendar year.

Various issues have been settled. Those remaining for resolution are whether contributions made by Friedman & Jobusch Architects & Engineers, Inc. (sometimes referred to as the Corporation), to a stock bonus trust established as a part of a trusteed deferred compensation plan, are deductible under section 404(a);[3] and whether petitioners Jobusch and Friedman received constructive dividends from the Corporation.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Fred H. and Josephine B. Jobusch, husband and wife, and Bernard J. and Irma R. Friedman, also husband and wife, were residents of Tucson, Ariz., when they filed their petitions herein, and when they timely filed their joint income tax returns with the Western Region Service Center, Ogden, Utah.

Friedman & Jobusch Architects & Engineers, Inc., is an Arizona corporation. When it filed its petition herein, Corporation's principal place of business was in Tucson, Ariz. Corporation timely filed its income tax returns for the tax years ending June 30, 1968, June 30, 1969, and June 30, 1970, with the Western Region Service Center, Ogden, Utah.

Petitioner Bernard J. Friedman (hereinafter Friedman) is a licensed architect; petitioner Fred H. Jobusch (hereinafter Jobusch) is a licensed architect and structural engineer. In October 1956, Friedman and Jobusch began practicing architecture together as partners. That partnership continued until July 1966 when Friedman and Jobusch formed Corporation to provide architectural services in connection with nonresidential construction projects. Since its formation, Friedman and Jobusch have been the only shareholders of Corporation, each owning 250 shares of class A common stock. Corporation is authorized to issue a total of 2,000 shares of class A common stock with a par value of $100, and 1,000 shares of class B common stock also having a par value of

---

[3] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question.

$100. In addition to being Corporation's only shareholders, Friedman and Jobusch, during the years in question, were respectively the president and vice president of Corporation, and were the only members of the board of directors.

One of the reasons Friedman and Jobusch decided to incorporate their architecture business was so they could establish a pension plan or profit-sharing plan that would benefit their employees. Their motivation for establishing a plan of deferred compensation was to provide additional employee benefits that would induce young employees to stay with the firm rather than establish competing firms after a few years of practice. Additionally, Friedman and Jobusch thought that some form of deferred compensation plan could eventually enable the junior employees to become the controlling shareholders in the firm. With these ideas in mind, Friedman and Jobusch caused the Corporation, on June 14, 1967, to adopt a stock bonus plan and enter into an agreement with Friedman, Jobusch, and Richard E. McClanahan, one of Corporation's senior employees, as trustees, for the creation of a stock bonus trust under the plan.

On June 15, 1967, Corporation announced to its employees the adoption of the stock bonus plan (hereinafter the Plan) and trust (hereinafter the Trust), and distributed to each of its approximately 30 employees a summary of the Plan and an individual account passbook. The summary of the Plan describes its purpose as follows:

The Stock Bonus Trust Plan is designed to ultimately transfer ownership of the corporation to the employees. Since stock in the corporation may not be available until the death of one of the present shareholders, the plan will also function as a type of employer-financed saving plan for those employees who die or terminate employment before the trust has acquired the stock of the corporation.

In June 1967, Corporation made a contribution to the Plan of $45,200. On its corporate income tax return covering the period ending June 30, 1967, Corporation claimed a deduction of $45,200 as payment to an employee's Trust.

On December 14, 1967, Corporation mailed to the District Director, Internal Revenue Service, Phoenix, Ariz., an "Application for determination under Section 401(a) and 501(a) for Friedman and Jobusch Architects and Engineers, Inc., Stock Bonus Plan." Included in Corporation's request were a copy of

the trust agreement and a completed Form 2950, "Statement in Support of Deduction for Payments to an Employees' Pension, Profit-Sharing, Stock Bonus Trust or Annuity Plan and Compensation Under a Deferred-Payment Plan." After considering the Plan and Trust, the District Director's Office requested certain amendments in the trust agreement, including a modification of paragraph 4.19. As originally drafted, paragraph 4.19 read:

*Distribution Methods:*

4.19 Payment shall be made on an initial distribution date, after all required accounting adjustments as of that date shall have been made, under one of the following methods as determined by the Committee:

(a) By payment in a lump sum within 90 days

(b) By payment in a series of installments, commencing within 60 days, equal or otherwise, over a reasonable period of time, not exceeding ten years, providing that the balance can be paid in full at any time

(c) By purchase from a legal reserve life insurance company selected by the Trustees of an annuity or endowment contract for his benefit containing such provisions as the Trustees determines [sic]; but in the case such a contract is purchased, then, to the extent of the amount of the participant's credit balance used to purchase such contract, the interest of the participant, or his beneficiary in the Trust Fund shall cease and terminate upon delivery of the contract to the person, or persons, then entitled to receive payments thereunder.

As amended, this paragraph of the trust agreement read:

4.19 Payment shall be made in stock of the employer within 90 days of death, disability, retirement or termination of employment.

After the requested amendments were adopted the District Director, on September 30, 1968, notified the Corporation that the Plan, "as presented, meets the requirements of section 401(a) of the Internal Revenue Code, and that the trust which forms a part thereof is exempt from income tax under the provisions of section 501(a) of the Internal Revenue Code."

When reviewing the Plan, the District Director's Office had no knowledge of an existing stock purchase agreement, and restrictions on the transfer of the stock found in the articles of incorporation and on the stock certificates. Of particular importance was a right of first refusal found in the articles of incorporation which gave the Corporation the right to purchase the shares of any stockholder who desired to transfer his stock, of any employee owning stock who left the services of the Corporation, or of any estate or beneficiary, at

a figure described as "book value." In contrast to this right of first refusal, the stock purchase agreement between Friedman, Jobusch, and the Corporation obligated the Corporation to purchase, at either Friedman's or Jobusch's death, their stock at its "adjusted book value." Adjusted book value is defined as "book value" adjusted by the addition of "goodwill" resulting in a value significantly above book value.

During the fall of 1967, Friedman and Jobusch discussed methods through which the Trust would eventually own all of Corporation's stock. In the course of these discussions, Friedman and Jobusch decided that the Trust should purchase sufficient life insurance on their lives so that upon their deaths the Trust would have funds to purchase their shares. Friedman and Jobusch considered having the Trust purchase newly issued policies on their lives, but learned from their insurance agent that because Jobusch had elevated blood pressure, a history of tuberculosis, a heart murmur, and history of kidney stones and gout, a new insurance policy could not be issued.

On October 20, 1967, the Corporation's board of directors held a special meeting in which it was resolved that the Trust would purchase from Irma R. Friedman, Fred H. Jobusch, and Josephine B. Jobusch, various life insurance policies payable in the event of Jobusch's or Friedman's death. The face value of the policies was $107,000, the cash value, approximately $24,959.34, and the purchase price paid by the Trust was $42,897.04. The purchase price of the policies was established after consultation with Friedman's and Jobusch's accountant and insurance agent. It was determined that an appropriate price to pay for the insurance policies was an amount equal to the sum of premiums already paid on the insurance policies. The sale, as intended by the October 20, 1967, resolution, occurred on February 9, 1968, at which time Jobusch and Friedman received checks of $22,074.30 and $20,822.74, respectively, from the Trust's bank account.

Although Jobusch and Friedman in good faith attempted to ascertain an appropriate purchase price for the policies, they neglected to reduce the amount of premiums paid on the insurance policies by the amount of dividends return on the policies to the policyholders. Consequently, petitioners Jobusch and Friedman now concede they respectively realized

long-term capital gain on the sale of the insurance policies in the amounts of $1,630.06 and $1,810.

On May 2, 1968, Corporation transferred to the Trust $6,000. On its income tax return covering the period ending June 30, 1968, Corporation deducted this sum as a payment to its employees' stock bonus trust.

On July 25, 1968, during the first month of Corporation's fiscal year, Corporation transferred $43,036.20 to the Trust. The following day, the trustees resolved to lend the Corporation $40,000 for 90 days at 6-percent interest. Consistent with this resolution, the Trust loaned Corporation $40,000 and Corporation executed an unsecured promissory note on July 29, 1968, obligating it to repay $40,000 at 6-percent interest in 90 days. Corporation borrowed the $40,000 from the Trust because it needed funds to meet its payroll. When Corporation borrowed the money from the Trust, Corporation had a $150,000 line of credit with a local bank, of which $75,000 was available for use. Corporation and the Trust's trustees concluded it would be preferable for Corporation to pay interest to the Trust rather than to an unrelated bank. Further, the trustees concluded that a 6-percent return was at least as profitable as any other investment they could enter into, since banks during this period were generally paying less than 6-percent interest on borrowed money.

Although the note from Corporation to the Trust was payable in 90 days, the first payment to the Trust did not occur until January 9, 1969. On that date, pursuant to a resolution dated December 8, 1968, Corporation transferred to Trust an interest, valued at $30,000, in Howard Investment, Ltd. (hereinafter Howard), a limited partnership. Howard was organized by Jack Sarver to construct a Howard Johnson's Motor Lodge. Sarver previously had worked with Friedman and Jobusch on projects in which they contributed their architectural skills and services and in return received an interest in the ownership of the completed project. Some of the projects were completed prior to Friedman's and Jobusch's incorporation. Ownership interests in the earlier projects were therefore issued to Friedman and Jobusch in their individual capacities. Howard, however, was organized after Friedman and Jobusch incorporated their architectural practice. Consequently, Sarver should have issued the Howard

Partnership interest to Corporation, rather than to Friedman and Jobusch individually, since it was Corporation that performed the architectural services for Howard. Sarver, however, followed his earlier practice, established while Friedman and Jobusch were doing business as a partnership, and erroneously issued interests in Howard to Friedman and Jobusch in their individual capacities. Friedman and Jobusch have never considered themselves the owners of any interest in Howard. At no time did Friedman or Jobusch spend or otherwise deposit in their personal accounts any money which was paid by Howard. Receipts for professional services rendered indicate that Corporation gave Howard a $30,000 credit for the interest which Corporation received from Howard. On its income tax return filed for the fiscal year ending June 30, 1969, Corporation reported $30,000 income representing the interest it received in Howard.

Because Sarver erroneously issued interests in Howard to Friedman and Jobusch, Friedman and Jobusch felt they had an obligation to transfer their interests in Howard to the Corporation. Pursuant to this obligation, Friedman and Jobusch, by resolution dated December 8, 1968, resolved to transfer their legal title in Howard to the proper owner, Corporation. This resolution which also indicates Corporation's intent to transfer its interest in Howard to the Trust reads as follows:

RESOLVED: That the corporation accept from Bernard J. Friedman and Frederick H. Jobusch the sum of $30,000.00 in the form of their total interest and investment in the Limited Partnership, Howard Investment, Ltd.; said interest and investment to be as follows:

Investment in the Partnership:

| | |
|---|---|
| Bernard J. Friedman | $5,000.00 |
| Frederick H. Jobusch | 5,000.00 |

Amount of Loan to the Partnership:

| | |
|---|---|
| Bernard J. Friedman | $10,000.00 |
| Frederick H. Jobusch | 10,000.00 |

Said $30,000.00 to be credited against the obligations of Bernard J. Friedman and Frederick H. Jobusch to the corporation.

It was further agreed that the sum of $30,000.00, interest in Howard Investments, Ltd., be transferred to Friedman & Jobusch Stock Bonus Trust, resulting in the reduction of the debt due from Friedman & Jobusch,

Architects and Engineers, Inc. to Friedman & Jobusch Stock Bonus Trust, since July 1968.

Following the adoption of this resolution, Friedman and Jobusch endorsed promissory notes issued by Howard and transferred them to the Trust. Consistent with this transfer, Trust's ledger indicates periodic interest payments based on the promissory notes from Howard.

The final payment on Corporation's $40,000 loan from the Trust occurred on April 8, 1970, when Corporation transferred $10,000 to the Trust. In addition to the two principal payments—one of a $30,000 interest in Howard and the other of a $10,000 check—Corporation made interest payments to the Trust on April 20, 1969, and on February 9, 1970.

Through a second arrangement with Jack Sarver, Corporation acquired an interest in a project alternatively referred to as University Inns, Inc., or Hotels, Ltd. (hereinafter Hotels). On February 4, 1970, Friedman and Jobusch, acting in their capacities as trustees, agreed to acquire a $48,000 interest in Hotels. As was the arrangement in Howard, the partnership interests were paid for by offsetting fees due the Corporation as a result of services rendered to Hotels. Consequently, Corporation on its income tax return for the period ending June 30, 1970, reported $48,000 income from Hotels. By resolution dated February 11, 1970, Corporation agreed to contribute the $48,000 interest in Hotels to the Trust. As a result of this resolution, Friedman and Jobusch, who had previously received the partnership interests in their individual capacities, transferred them to the Trust. Payments made by Hotels were made to Trust and duly recorded in Trust's ledger.

Also during its fiscal year ending June 30, 1970, Corporation made a contribution of $15,000 to the Trust. Based on this contribution, plus the contribution of its interest in Hotels, Corporation deducted $63,000 on its income tax return for contributions made to the Trust during the fiscal year ending June 30, 1970.

During the years in question, no stock in the Corporation was acquired by the Trust for distribution to any participants under the Plan. There were, however, the following distribu-

tions of cash to Plan participants upon termination of their employment:

*Year ending June 30, 1969:*

| | |
|---|---|
| John Arrigotti | $23.05 |
| Anton Brence | 194.81 |
| Melvin Cole | 39.32 |
| James Hockings | 211.99 |
| Judith Cylke | 6.78 |
| Jim Sutherland | · 70.91 |
| Earl Chann | 385.72 |

*Year ending June 30, 1970:*

| | |
|---|---|
| Roy Dewey | $1,570.36 |

On at least three occasions, the Trust loaned money to Friedman and Jobusch. These loans were memorialized by unsecured 90-day demand notes bearing interest at then prevailing market rates. The privilege of borrowing from the Trust has never been extended to any of Corporation's other employees since, as Jobusch acknowledged at trial, there was "a company policy of not loaning money from the trust to the—to the employees."

### OPINION

We must decide two issues: whether contributions made by Friedman & Jobusch Architects & Engineers, Inc., to a stock bonus trust are deductible under section 404(a); and whether Friedman and Jobusch received constructive dividends from the Corporation.

Petitioners contend that the stock bonus plan and trust, as established and maintained during the years in question, at all times met the requirements of sections 401(a) and 501(a). Consequently, employer contributions made to the Trust were deductible under section 404(a). Additionally, petitioners contend that Friedman and Jobusch, as shareholders of the Corporation, never received beneficial ownership of any property as a result of Corporation's business activities. Therefore, Friedman and Jobusch contend they did not receive constructive dividends from the Corporation.

In contrast, respondent contends that the Plan and Trust, as established, inherently discriminated in favor of Friedman and Jobusch and therefore the Plan and Trust failed to meet the requirements of section 401(a). Consequently, contribu-

tions made to the Trust were not deductible under section 404(a). If we disagree with his first argument, respondent contends that employer contributions were not deductible during the years in question because the Trust, as operated, engaged in prohibited transactions with the purpose of diverting corpus or income of the Trust from its exempt purposes and such transactions involved a substantial part of the corpus or income of the Trust. Respondent also contends that Friedman and Jobusch received constructive dividends when they acquired ownership interests in two limited partnerships.

We have thoroughly considered the facts before us, the legal arguments set forth by the parties, and the applicable law, and conclude that during the years in issue the Plan and Trust failed to meet the requirements of sections 401(a) and 501(a). Consequently, employer contributions thereto were not deductible under section 404(a). On the second issue, we conclude that during the years in issue, Friedman and Jobusch did not receive constructive dividends from the Corporation.

Generally, sections 404(a) and 404(a)(3) provide that employer contributions paid to a stock bonus trust pursuant to a stock bonus plan may be deductible only if the trust is exempt from taxation under section 501(a). Section 501(a) exempts from taxation organizations described in section 401(a) so long as they do not engage in prohibited transactions under section 503 and are not feeder organizations described in section 502.

Section 401(a) places a number of organizational requirements on stock bonus,[4] pension, or profit-sharing plans and

---

[4] A stock bonus plan is defined by sec. 1.401–1(a)(2), Income Tax Regs., as "a definite written program and arrangement which is communicated to the employees and which is established and maintained by the employer * * * to provide employees or their beneficiaries benefits similar to those of profit-sharing plans, except that such benefits are distributable in stock of the employer, and that the contributions by the employer are not necessarily dependent upon profits." Petitioner Corporation had a definite written plan that was communicated to its employees. Respondent contends that the benefits thereunder were not distributed in the stock of the employer as required by the regulations. Respondent misreads his own regulations on this point: "distributable" means "capable of being distributed," not, "must be distributed." There is some question, even under this liberal definition, whether the Trust was capable of distributing Corporation's stock since at no time did the Trust own any of Corporation's stock. Further, during much of the time in question, the Trust was incapable of purchasing any treasury stock, since its assets were tied up in prohibited investments. Finally, despite the specific amendment to par. 4.19 of the trust agreement that required payments to be made in stock of the employer within 90

trusts. Of particular importance to this case is section 401(a)(4) which states that a trust may be qualified,

if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees.

A stock bonus plan must be both nondiscriminatory in its form and nondiscriminatory in its operation. *Cornell-Young Company v. United States,* 469 F.2d 1318, 1324 (5th Cir. 1972).

Section 1.401–4(a)(2)(iii), Income Tax Regs., provides a general test for discerning discrimination:

Variations in contributions or benefits may be provided so long as the plan, *viewed as a whole for the benefit of the employees in general, with all its attendant circumstances, does not discriminate in favor of employees within the enumerations* with respect to which discrimination is prohibited. [Emphasis added.]

Viewing the Plan and Trust as a whole along with the attendant circumstances, we conclude that the Plan, in its form and in its operation, is discriminatory in favor of Friedman and Jobusch, two employees within the prohibited enumerated class.

As approved by the District Director's Office, the Plan established by the Corporation generally required that benefits be paid in the form of employer stock. Not disclosed to the District Director's Office at the time of approval, however, were trading restrictions found on the stock certificates and in the Corporation's articles of incorporation. Essentially, these trading restrictions required any shareholder, estate, or devisee of a shareholder, who intended to transfer the stock to notify the Corporation of his intent. Once notified, the Corporation had 30 days within which to purchase the stock from the transferor at "book value."[5] The

---

days of death, dismissal, retirement, or termination of employment, all distributions to terminated employees were made in cash. Because we conclude the Plan violated the antidiscrimination provision of sec. 401(a), and therefore the Trust was never exempt under sec. 501, we need not determine whether a stock bonus trust must at all times have stock or sufficient funds in its corpus with which it can purchase stock from the corporation.

[5] The parties have stipulated that the method of computing book value per share is to divide the total amount shown as capital stock investment and retained earnings of the Corporation by the number of issued and outstanding shares of stock of the Corporation.

effect of these trading restrictions is that the value of Corporation's stock to most shareholder-employees was limited to its book value.

Independent of the trading restrictions found in the articles of incorporation and on the stock certificates, Friedman, Jobusch, Corporation, and trustees for the stock bonus trust entered into a stock purchase agreement, also undisclosed to the District Director's Office, that required either the Corporation or the Trust to purchase Friedman's or Jobusch's stock upon his death. The price at which the Corporation was to purchase the stock is described as "adjusted book value." Adjusted book value is book value per share adjusted by the addition of goodwill. Under the formula prescribed for valuing goodwill, it is possible to increase the book value of either Friedman's or Jobusch's stock holdings significantly.

Comparing the effect of the trading restrictions and the stock purchase agreement, it becomes apparent that benefits under the Trust agreement and under the attendant, related documents, inherently discriminate in favor of Friedman and Jobusch. Essentially, one share of corporate stock distributed to an employee-participant is of significantly less value than one share of corporate stock owned by either Friedman or Jobusch since shareholder-employees, other than Friedman or Jobusch, may only receive book value for their stock. In contrast, Friedman and Jobusch may receive a significantly greater sum, adjusted book value.

In addition to discrimination inherently found in the Plan and related documents, the Trust in its operation granted Friedman and Jobusch benefits not allowed other employees. On at least three occasions, both Friedman and Jobusch borrowed money from the Trust for their own personal use. These loans, as with loans made to the Corporation on various occasions, were unsecured and as such constituted prohibited transactions under section 503(b).[6]  *Van Products, Inc. v.*

---

[6] Since we find the Plan and its related documents discriminatory in form and operation, the Plan is not one described in sec. 401(a). Consequently, it is unnecessary to determine which taxable years are affected by the sec. 503(b) prohibited transactions. See generally sec. 503(a)(2). Nevertheless, we note that because of the numerous loans to all three petitioners, the Trust corpus, during the years in question, consisted primarily of insurance policies and unsecured demand notes, with very small cash reserves.

*Commissioner,* 40 T.C. 1018 (1963). Although the privilege of borrowing from the Trust was extended to Friedman, Jobusch, and the Corporation, petitioner Jobusch candidly acknowledged at trial that the Trust had never loaned money to any other employees of the Corporation, since there was "a company policy of not loaning money from the trust to the—to the employees." Consequently, we must view the privilege of borrowing from the Trust, extended to Friedman and Jobusch, but denied the remaining employees, as a benefit discriminatorily granted only to members of the prohibited enumerated class.

Because we have found that benefits under the Plan and Trust, as established and operated, discriminated in favor of Friedman and Jobusch, we conclude the Plan was not one described in section 401(a). Therefore, employer contributions to the Trust are not deductible under section 404(a).[7]

The second issue we must resolve is whether petitioners Friedman and Jobusch received constructive dividends from the Corporation during the years in question. In 1968 and 1970, Friedman and Jobusch received, in their individual capacities, partnership interests in Howard Investment, Ltd., and Hotels, Ltd. These partnership interests were paid for by the Corporation which offset fees due from the limited partnerships for services rendered. Shortly after receiving the partnership interests, both Friedman and Jobusch transferred them, without consideration, to the Corporation.

Respondent contends that based on the transactions with Howard and Hotels, Friedman and Jobusch received constructive dividends. Respondent's entire argument on this issue is as follows:

While the facts before the Court are admittedly somewhat unclear, the petitioners as the actual participants to these transactions presumably had access to all of the facts and have failed to present evidence which would overcome the respondent's presumption of correctness on this issue * * *

We agree with respondent on one point. Petitioners have the burden of proof on this issue. *Welch v. Helvering,* 290 U.S.

---

[7] The parties have further stipulated that if the Plan is not a qualified deferred compensation plan, the Corporation will be allowed a deduction for post-Aug. 1, 1969, contributions to the extent the employees acquired a vested interest therein. Under these circumstances, Friedman and Jobusch concede they must each include in his income for the year his vested post-Aug. 1, 1969, contributions. See sec. 402(b).

111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. We disagree, however, with the conclusion that petitioners have failed to overcome respondent's presumption of correctness. Consequently, on this issue we hold for petitioners.

Petitioners have clearly shown that Jack Sarver, the promoter behind Howard and Hotels, erroneously issued the partnership interests to Friedman and Jobusch in their personal capacities despite their initial subscription as "trustees." Sarver, in issuing the partnership interests, merely followed a practice previously established when Friedman and Jobusch conducted business as a partnership. Friedman and Jobusch rectified Sarver's error by transferring to the Corporation, without any consideration, their partnership interests in Howard and Hotels. Consistent with petitioners' explanation, the Corporation reported the value of the partnership interests in its income in the same taxable years the offset and payment occurred. Friedman and Jobusch testified that they did not consider themselves the owners of the Howard and Hotels partnership interests, since they were not the ones who performed the services. Again, consistent with their testimony, income from the partnerships during the years in question was credited to the Trust, the Corporation's transferee. Viewing these facts we conclude that petitioners Friedman and Jobusch did not receive constructive dividends in the form of Howard and Hotels partnership interests.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*