JAMES E. THOMPSON, JR., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE AND BOARD OF TRUSTEES OF THE CENTRAL PENSION FUND OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS AND PARTICIPATING EMPLOYERS, RESPONDENTS

Docket No. 8723–77R.     Filed July 30, 1980.

*Ellis J. Sobol,* for the petitioner.
*Deborah A. Butler* and *Cheryl White,* for the Commissioner of Internal Revenue.

OPINION

FEATHERSTON, *Judge:* The Commissioner of Internal Revenue (the Commissioner) determined that the Central Pension Fund of the International Union of Operating Engineers and Participating Employers (Central) meets the requirements of section 401(a).[1] Petitioner, an "interested party" within the meaning of section 7476(b)(1), challenges the Commissioner's determination and has invoked the jurisdiction of this Court for a declaratory judgment under section 7476.

The issues presented for decision are:

(1) Whether the plan fails to meet the minimum funding standards of section 412 because (a) benefits were paid to or on behalf of employees of one employer (the city and county of Denver) in excess of amounts contributed by those employees or (b) employees of another employer (Adolph Coors Co.), not electing contributions, may nonetheless receive retirement benefits based in part on the period of employment with that company.

(2) Whether the plan fails to meet the antidiscrimination requirement of section 401(a)(4) because employees whose benefits are based in part on periods of union membership may receive greater retirement benefits than those whose benefits are based largely on periods of work for an employer contributing on their behalf or because, under certain collective bargaining agreements, amounts may be contributed for only a limited number of hours that employees work.

Pursuant to Rule 217(b), Tax Court Rules of Practice and Procedure, this case was submitted for decision on the administrative record, certified as to its genuineness by an official authorized to act for the Commissioner.

Central is a multiemployer pension plan adopted effective September 7, 1960. The plan was amended affective January 1, 1976. In June 1976, the board of trustees of Central (the board) requested that the District Director, Internal Revenue Service, Baltimore, Md., determine that the plan, as amended, continued to qualify under sections 401(a) and 501(a). The application included a copy of the Heavy and Highway Construction

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

Agreement, which was in effect from May 1, 1973, to May 1, 1976. This agreement was one of over 5,000 collective bargaining agreements related to the plan.

Section 12.01 of the plan, as amended, provides that: "All contributions to provide the benefits under this Plan shall be made by the Participating Employers and no contributions shall be permitted by Participants." That section further sets the rate of contributions as that agreed upon by the union and each employer from time to time.

Generally, an employee's "Initial Participation Date" is "the first date for which contributions are made under the Plan on behalf of an Employee." For an employee retiring after October 1, 1972, "Credited Past Service" includes "the period of his active membership in the Union, during the period prior to his Initial Participation Date, and subsequent to his 35th birthday." "Credited Future Service" covers periods of employment after the employee's initial participation date with respect to which one or more participating employers contribute to the plan on the employee's behalf. Under the plan, retirement benefits are calculated as a dollar amount for each year of a participant's credited past service plus a percentage of the contributions made under the plan during his period of credited future service.

In general, the dollar amount for each year of credited past service is keyed to the contribution rate in effect as of the employee's initial participation date, $2 for a contribution rate of 10 cents per hour or an amount in the same proportion for a different cents-per-hour contribution rate. If the contribution rate changes after the initial participation date, the dollar amount is based on the average rate of contributions made on the employee's behalf until his retirement date.

Effective April 16, 1970, the city and county of Denver (Denver) agreed to be bound by the agreement and declaration of trust establishing Central. With respect to Denver's payments, the agreement provided:

> It is understood and agreed that no funds of the City and County of Denver are involved; * * * and that payments to the Central Pension Fund of the said Union consist solely of deductions from the pay of those City employees who are Union members and have authorized such deductions in writing.

By October 12, 1971, Frank Gould (Gould), administrative manager of Central, had been advised that the Denver agreement provided for contributions by means of payroll deductions,

in other words, for employee contributions, and was therefore inconsistent with provisions of the plan. Throughout the following several years, Central consulted with Denver officials, the Internal Revenue Service, and the Department of Labor with respect to problems posed by the Denver agreement. Denver never contributed by means of employer contributions.

By a letter mailed June 23, 1976, petitioner and Irving N. Fox, a former employee with a vested right under the plan, submitted to the District Director, Baltimore, Md., a comment letter which raised four specific matters. The comment letter first alleged: "Individual Contributions have been allowed in the past contrary to the Trust and Plan, and are still being allowed, contrary to The Amended Trust Plan and Code of The Internal Revenue Service." In support of this allegation, the letter cited the agreement pursuant to which Denver contributed by means of payroll deductions.

As another violation,[2] the letter stated that: "The Plan is discriminatory by allowing some the option to take cash payments in lieu of having payments made into the Trust Fund." Specifically, it noted the following agreement made by the Adolph Coors Co. (Coors):

regular employees who elect in writing prior to September 1, 1969, to have pension contributions made on their behalf by the Employer instead of receiving vacation or vacation pay. Any regular employee who desires to have the Employer make pension payments on his behalf instead of receiving vacation or vacation pay, shall send a letter to this effect addressed to Russell C. Hargis, Vice President, Industrial Relations, Adolph Coors Company, Golden, Colorado, * * * on or before September 1, 1969, stating that the employee in question desires to have pension payments made on his behalf to the Central Pension Fund of the International Union of Operating Engineers and Participating Employers, instead of receiving vacation pay. Once such election is made it shall be irrevocable for the duration of the Agreement.

The letter described the Coors agreement as "a variation from the terms of said Plan as filed with the Internal Revenue Service, and discriminatory toward the fast [sic] majority of employees." Alleged discrimination was explained as follows:

Allowing some members, * * * the opportunity to pay into the Plan at their

---

[2]Petitioner does not now rely on another ground set forth in the letter that: "The Plan Trust has no qualms about filing a false report with the Labor Department or Internal Revenue Service." This allegation referred to a U.S. Department of Labor Form D–1S filed with respect to the plan, which stated in part that "there are no employee contributions."

option grants them a better opportunity to qualify for a better pension because they will not have to average their contributions, or contributions made on their behalf, and still will have accrued service because of their membership in the union. Since the union controls the employees work, certain employees can be directed to certain jobs to better qualify for benefits.

Finally, the letter observed that: "Payments on the total hours worked vary from employer to employer." Maintaining that the plan provides for employer contribution of a certain amount per hour for all hours, both straight and overtime, worked by an employee, the interested parties stated that "some agreements have a cutoff point in hours, thus creating an unfair situation for some who work over the cutoff point."

At the request of the Internal Revenue Service, the board reviewed the provisions of the Coors agreement. In a letter dated March 22, 1977, and stamped "RECEIVED MAR. 24, 1977," Gould informed the Internal Revenue Service of the board's conclusion that the agreement "is uniform with respect to all employees within the Bargaining Unit and that the contributions are made by the participating employer and are not in conflict with the provisions of the Trust." The same letter detailed the actions taken to terminate Denver's participation in the plan. An attachment listed several unrelated amendments to the plan.

By a letter dated May 25, 1977, the District Director informed petitioner's designated representative, Irving N. Fox, that a favorable final determination letter with respect to qualification under section 401 had been issued to Central. On the same date, the District Director notified Central of its favorable determination as to qualification of plan amendments. The determination was conditioned upon Central's "adoption of the proposed amendments submitted in your representative's letter dated 03–24–77."

## 1. *Minimum Funding Issue*

In petitioner's view, the minimum funding standards established by section 412 are violated when employee benefits are based in part on periods during which the plan received no contributions on behalf of the employee. The plan provides, as petitioner observes, for accrual of credited past service, and thus computation of benefits, for periods during which an employee was a union member but not an employee of an employer

contributing to the plan. Moreover, the Coors agreement permits employees to elect plan contributions rather than vacation or vacation pay.

The combination of these provisions, petitioner concludes, may result in the following two situations, each of which, in his view, violates section 412. If a Coors employee who is a union member and who does not elect plan contributions later works for an employer who contributes on his behalf, he may receive past service credits attributable to the period he worked at Coors. If another union member who works for a nonparticipating employer throughout most of his career begins work at Coors shortly before retirement and elects contributions, he may also receive past service credits for the period during which he worked for a nonparticipating employer. Petitioner further argues that the section 412 minimum funding standards are violated by payment of benefits to Denver employees in excess of contributions made pursuant to the Denver agreement. In our view, petitioner's reliance on section 412 is misplaced.[3]

For a plan including a trust which qualifies, or at one time qualified, under section 401(a), section 412 establishes a "minimum funding standard for such plan for a plan year." A plan satisfies the minimum funding standard for a plan year if at the end of such year the plan does not have an "accumulated funding deficiency." If an accumulated funding deficiency exists, the employer is in general subject to excise taxes under section 4971. H. Rept. 93–779 (1974), 1974–3 C.B. 244, 339–341.

Section 412 applies not to a plan or trust but rather to a plan year and then only after the trust or plan qualifies under either section 401(a), 403(a), or 405(a). Once qualified under one of these sections, the plan continues to be subject to the requirements of section 412 even if it is subsequently disqualified. Sec. 412(a)(1) and (2); H. Rept. 93–779, *supra*, 1974–3 C.B. at 317; Conf. Rept. 93–1280 (1974), 1974–3 C.B. 415, 444. As the wording of the statute indicates, compliance with section 412 is not relevant to the Commissioner's determination as to plan qualification under section 401(a). This conclusion is reinforced by the contrast between the terms of section 412 and those of sections

---

[3]Citing no other statute, petitioner also states that "actuarial unsoundness" is produced by the Denver and Coors agreements. We treat this allegation as part of petitioner's argument with respect to sec. 412.

410(a) and 411(a), both of which impose requirements essential to plan qualification under section 401(a).[4] See also secs. 1.410(a)–1(a) and 1.411(a)–(1)(a), Income Tax Regs.; H. Rept. 93–807 (1974), 1974–3 C.B. (Supp.) 236, 343.

In any event, due to the effective date provisions, section 412 applies to no Central plan year which had ended when the favorable determination was made. In the case of a plan maintained on January 1, 1974, pursuant to one or more collective bargaining agreements, application of section 412 is postponed until plan years beginning after the earlier of December 31, 1980, or "the date on which the last of the collective bargaining agreements relating to the plan terminates (determined without regard to any extension thereof agreed to after the date of the enactment of this Act)." Sec. 1017(c)(1)(B) and (2)(A), Pub. L. 93–406, 88 Stat. 829, as amended by sec. 402, Pub. L. 94–12, 89 Stat. 26; Conf. Rept. 93–1280 (1974), 1974–3 C.B. 415, 454–455.[5]

The record does not disclose the identity of the last of the collective bargaining agreements relating to the plan. However, the Heavy and Highway Construction Agreement, enclosed in the application, was in effect from May 1, 1973, to May 1, 1976. Hence, section 412 applied to the plan at issue no earlier than the fiscal year ended January 31, 1978. Central requested a determination of continued qualification on June 15, 1976, and the District Director issued such a determination on May 25, 1977. Thus, at the time the determination was made, the Internal Revenue Service had before it no completed plan year to which the section 412 minimum funding standard applies.

Moreover, before issuance of the favorable ruling letter, the board terminated the participation and benefits of all Denver employees, refunding their contributions, and refusing to accept any additional contributions. These steps were taken prior to the

---

[4]Secs. 410(a)(1)(A) and 411(a) provide: "A trust shall not constitute a qualified trust under section 401(a)."

[5]Conf. Rept. 93–1280 (1974), 1974–3 C.B. 415, 454, explains:

"Generally, in the case of plans existing on January 1, 1974, the new funding provisions are to become applicable for plan years beginning after December 31, 1975. In the case of collectively bargained plans (both single employer and multiple employer plans) existing on Jaunary 1, 1974, the effective date would be delayed until the termination of the contract existing on January 1, 1974, but not later than the plan years beginning after December 31, 1980. * * * "

effective date of section 412 applicable to Central. Therefore, petitioner's section 412 argument is based in part on the Denver participation which was terminated prior to the applicable effective date of that Code section.

## 2. *Discrimination Issue*

In petitioner's view, discrimination results from a combination of the Coors agreement provision allowing elective contributions and the plan provision crediting past service for certain periods of union employment. Benefits based on credited future service for periods during which the employer contributes on the employee's behalf, petitioner notes, are computed at an average of the contribution rates in effect during those periods. Benefits based on past service credits, however, are computed at the contribution rate in effect when the employee worked for an employer contributing on his behalf. Such a rate is necessarily a more recent one and, due to the tendency of contribution rates to rise over the years, higher than an averaged rate. Hence, an employee who does not elect contributions under the Coors agreement and who, shortly before retirement, works for an employer contributing on his behalf, not only enjoys vacation or vacation pay while employed by Coors but also receives a larger pension than a counterpart for whom contributions are made during a greater portion of his career. Those favored by the union can, petitioner claims, be directed to jobs which produce such preferable pension benefits.

In addition to this instance of what he deems discrimination in benefits, petitioner notes differences in contributions also violative, in his view, of the antidiscrimination requirements. Contributions made pursuant to certain unspecified bargaining agreements cover, he alleges, only a limited number of work hours in contrast to those under other agreements. An employee working under one of the former agreements has lesser amounts contributed on his behalf. In our view, the foregoing situations do not constitute discrimination within the meaning of section 401(a)(4).

A plan does not meet the requirements of section 401(a) unless it satisfies the paragraph (4) rule that—

the contributions or benefits provided under the plan do not discriminate in favor of employees who are—

(A) officers,

(B) shareholders, or

(C) highly compensated.

Variation in contributions or benefits among employees does not constitute discrimination unless such variation discriminates "in favor of employees within the enumerations with respect to which discrimination is prohibited." Sec. 1.401–4(a)(2)(iii), Income Tax Regs. See also sec. 1.413–1(c)(2), Income Tax Regs. Petitioner has neither alleged nor set forth facts which would suggest that those receiving greater contributions or benefits are officers, shareholders, or highly compensated; in other words, the prohibited group. Thus his argument, on its face, does not allege discrimination within the meaning of section 401(a)(4). Compare *Jobusch v. Commissioner*, 68 T.C. 929, 939–942 (1977); *McMenamy v. Commissioners*, 54 T.C. 1057, 1061–1065 (1970), affd. 442 F.2d 359 (8th Cir. 1971).

To reflect the foregoing,

*Decision will be entered for the respondents.*